**MAX SUGARMAN FUNERAL HOME, INC., et al., Plaintiffs, Appellees,**

v.

**A.D.B. INVESTORS, Defendant, Appellant.**

**No. 89–2046.**

United States Court of Appeals, First Circuit.

Heard March 5, 1990.

Decided Feb. 28, 1991.

§ ___(_)(_).

Robert D. Wieck with whom Adler Pollock & Sheehan Inc. was on brief, Providence, R.I., for defendant, appellant.

Z. Hershel Smith with whom DiSandro–Smith & Associates, P.C., Inc. was on brief, Providence, R.I., for plaintiff, appellee Jason Monzack, Trustee.

Before CAMPBELL, Chief Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

The present appeal implicates important issues of bankruptcy law in a complex factual setting involving a moribund funeral home whose inevitable financial demise was lucratively delayed for years by insiders who financed its life support system at the expense of unsuspecting debenture holders who were left holding the bag when the plug was pulled by the onset of these involuntary bankruptcy proceedings. The ultimate question on appeal is whether the powers of the trustee in bankruptcy are equal to the task of redressing the egre-

gious abuses disclosed by the evidence presented before the bankruptcy court.

## I  BACKGROUND

The following facts were found by the bankruptcy court and are supported by the evidence. In March 1970, Erwin M. Bosler, Roy Lehrer, and Robert B. Goldblatt, acting through their company, E.M.B. Associates, Inc. ("EMB"), purchased from the Sugarman family all of the corporate stock of Max Sugarman Funeral Home, Inc. ("SFH"), as well as the real estate used in the funeral home operation. The three EMB principals invested $75,000 of their own money, and borrowed an additional $350,000 from friends, with which to fund a portion of the purchase price. The balance of the purchase price, $775,000, was financed by the Sugarman family, who retained a first mortgage on the SFH real estate. In October 1970, EMB borrowed $300,000 from the Rhode Island Hospital Trust National Bank ("Bank") with which to repay the purchase money loan from the friends of the three EMB principals.

By late 1970 it had become clear to EMB that the cash flow from the Sugarman funeral home would be insufficient to meet the amortization schedules on the Bank's mortgage loan and the Sugarman family mortgage. From that time and until SFH and EMB were petitioned into involuntary bankruptcy in 1982, Erwin Bosler, who ran the funeral home operation, enticed eighty-five individuals to purchase $1,854,000 in five-year, 13% debentures issued by EMB, doing business as Max Sugarman Funeral Home, Inc. ("debentures").

During January 1973, EMB embarked on a supplemental financing program for funding the funeral home operation. Alan Brier, EMB's accountant, formed ADB Investors ("ADB") as a Rhode Island limited partnership, with Brier as its general partner. ADB entered into an agreement ("1973 loan agreement") to lend $450,000 to EMB in quarterly installments over a period of seven and one-half years.[1] Under the 1973 loan agreement, EMB was required to pay, contemporaneously with the disbursement of each quarterly loan installment: (1) a 3 to 5½ percent commission to Brier; and (2) interest to ADB at 12% per annum, or 2% over the prime corporate rate, whichever was greater.[2] The loan principal was to be repaid in one lump sum, or balloon payment, due July 1, 1980, the date the Sugarman family purchase money loan was scheduled to be retired. The ADB loan was to be secured by a pledge of all issued and outstanding stock of EMB and SFH.[3] Finally, under the 1973 loan agreement EMB agreed that if its "long term" indebtedness were to exceed $1,000,000, the excess would be subordinated to all ADB debt.

Alan Brier served as EMB's accountant through 1980. In that capacity, Brier prepared misrepresentative financial statements and false 1977–78 consolidated tax returns for EMB and SFH. The financial statements understated EMB/SFH's interest payments and, apart from a footnote in the 1979 statement, made no mention whatever of the 1973 loan agreement with ADB. The 1977–78 EMB/SFH consolidated tax returns also understated the amount of interest paid by EMB/SFH. Even after Brier ceased to act as EMB's accountant in 1981, he continued to have actual knowledge of the funeral home's financial dealings, including the accelerating debenture sales by Bosler. The bankruptcy court supportably found that Brier and Bosler acted in concert to depict SFH/EMB business operations in a false light in order to lure further financing through debenture

---

**1.** At the time of the 1973 loan agreement, ADB advanced EMB an additional $48,000, increasing total contemplated loan advances to $498,000.

**2.** By the first quarter of 1978, EMB was disbursing more to ADB and Brier, in interest and commissions, on each loan advance than it was receiving from ADB. Hence, from January 1,

1978 to April 1, 1980, the 1973 loan agreement resulted in a negative cash flow to EMB. *See infra* note 6.

**3.** ADB concedes that the EMB and SFH stock pledge was not perfected, as the stock certificates were never placed in escrow.

sales.[4] On February 8, 1984, Erwin Bosler received a three-year prison term for securities fraud in connection with his sales of funeral home debentures.

In early 1980, Bosler informed Brier that EMB could not make the balloon payment due ADB on July 1, 1980 as required by the 1973 loan agreement.[5] Soon after, ADB discovered that its security interest in EMB's and SFH's corporate stock was unperfected. EMB and ADB then undertook, in October, 1980, to memorialize a revision of their entire credit relationship ("1980 refinancing"), in the form of a $500,000 promissory note, at ten percent interest, which was secured by a mortgage on all funeral home real estate, a security interest in all personal property used in the funeral home operation, and a pledge of all EMB and SFH stock (collectively: "1980 refinancing liens"). The new $500,000 note prescribed an escalating repayment schedule: $2,000 per month in year one, $7,000 per month in year two, $8,000 per month in year three, $9,000 per month in year four, and $10,000 per month in year five.

In October 1981, Bosler caused SFH to convey all its tangible and intangible personal property to Dade Service Company ("Dade"). At the same time, EMB conveyed title to the funeral home real estate to Bristol Associates, Inc. ("Bristol"). Roy Lehrer was the principal officer and sole stockholder of Dade and Bristol. Lehrer, along with Erwin Bosler and Robert Goldblatt, was an EMB founder and principal. Dade acquired the funeral home personal property subject to all EMB/SFH trade accounts payable, security agreements of record (including, of course, the 1980 refinancing liens acquired by ADB) and all past obligations due Roy Lehrer. The deed purportedly conveying the real estate to Bristol recited no consideration and ADB concedes that no consideration passed. Alan Brier had actual knowledge of these transfers (collectively: "1981 transfers") and knew as well that Erwin M. Bosler remained actively involved in the day-to-day operations of the funeral home following the 1981 transfers of all SFH/EMB assets to Dade and Bristol.

The funeral home's financial difficulties continued to worsen throughout the five-year period between 1978 and 1982, when involuntary bankruptcy proceedings were commenced against EMB and SFH. During 1978, debenture sales nearly tripled, increasing from $142,000 in 1977 to $396,000 in 1978. By the end of 1978, EMB/SFH's non-ADB indebtedness went over the $1,000,000 level, triggering the 1973 loan agreement subordination provision. ADB nevertheless continued to advance money to EMB, which went entirely to Brier for commissions and to ADB as interest, thereby increasing the amount of principal due and payable July 1, 1980. By early 1979, if not long before, it had become crystal clear that it was *only through more and more debenture sales* that EMB could hope to service its Bank mortgage, the Sugarman family mortgage and its mounting debenture debt, not to mention meet the balloon payment due ADB July 1, 1980.[6]

The 1980 refinancing provided the funeral home with a deceptive respite from its balloon payment obligation to ADB, at once postponing and sealing EMB's inevitable financial collapse. Instead of defaulting at once on the $500,000 balloon payment due July 1, 1980, EMB was to pay ADB $2,000 a month during 1980–81. As soon as monthly payments escalated to $7,000 in year two, however, default once again loomed immediate and could be delayed temporarily only through increased

---

4. Brier and Bosler engaged in business dealings other than those involving the funeral home. Bosler was a public accountant before EMB acquired SFH. Thereafter, Brier took over Bosler's accounting practice.

5. Erwin Bosler continued to run EMB during 1980. Lehrer and Goldblatt had been bought out, leaving Erwin Bosler's wife, Miriam, as EMB's sole shareholder.

6. The bankruptcy court found that, after payments on the Bank loan, the funeral home had an *annual* net cash flow of approximately $50,000 with which to meet *all* other debt obligations. EMB/SFH's annual debenture *interest* obligations alone exceeded $50,000 by 1979. *See also supra* note 2.

debenture sales.[7] It was not by accident, therefore, that sixty percent of all debenture sale proceeds were generated during the four-year period immediately preceding the EMB and SFH involuntary bankruptcy adjudications, notwithstanding the fact that debenture sales spanned a twelve-year period.

The inevitable could be postponed no longer than April 1982, however, when EMB failed to make its $7,000 monthly payment to ADB. ADB thereupon obtained from Bristol a deed to the funeral home real estate "in lieu of foreclosure." Similarly, Dade delivered ADB a bill of sale, "in lieu of foreclosure," to all SFH personalty. (Collectively: "1982 transfers.") ADB leased back to Dade all SFH real and personal property for a five-year term, with options to renew or purchase. Erwin Bosler and family guaranteed the lease and continued to operate the funeral home. Two months later, SFH and EMB were adjudicated bankrupt at the instance of three debenture holders. The principal owed on debenture debt at the date of bankruptcy totalled $1,401,000.

The trustee in bankruptcy of SFH and EMB filed a complaint to set aside the 1982 transfers as preferential, *see* 11 U.S.C. § 547, and fraudulent, *see id.* § 548, to recover the funeral home assets for the benefit of the debtor estates, and to effect an equitable subordination of ADB's 1980 refinancing liens on all assets of the debtor estates, *see id.* § 510(c).

The first bankruptcy court order did not resolve the trustee's fraudulent transfer and preference claims under Bankruptcy Code §§ 547 and 548, but relied instead on Bankruptcy Code § 510(c) for all relief afforded the trustee. The bankruptcy court found that Brier's business conduct, beginning in 1978, was designed to advance Brier's and ADB's interests to the detriment of debenture holders. On the basis of its determination that Brier was an EMB "in-

sider," the court concluded that Brier's conduct warranted equitable relief under Bankruptcy Code § 510(c). Accordingly, relying on Bankruptcy Code § 510(c) the court *avoided* the 1981 transfers, the 1982 transfers, and the 1980 refinancing liens, and subordinated any remaining unsecured claim of ADB to the unsecured claims of post–1977 debenture holders. 92 B.R. 9.

ADB appealed to the United States District Court for the District of Rhode Island, claiming that Bankruptcy Code § 510(c) cannot be used as a *lien* or *transfer avoidance* device. Without determining whether Bankruptcy Code § 510(c) may be employed as an avoidance device, the district court vacated the first bankruptcy court order and remanded for a determination whether the 1982 transfers were preferential or fraudulent under Bankruptcy Code §§ 547 and 548.

The bankruptcy court ruled on remand that the 1982 transfers were voidable preferences and fraudulent transfers under Bankruptcy Code §§ 547 and 548(a)(1), respectively. 100 B.R. 629. The second bankruptcy court order was premised on its earlier ruling that the 1981 transfers were a sham, and that ADB was not the holder of a valid lien on the funeral home assets at the time the 1982 transfers were made because the 1980 refinancing liens were subject to equitable subordination under Bankruptcy Code § 510(c).

ADB again appealed. The district court overturned that portion of the second bankruptcy court order which set aside the 1982 transfers as preferential under Bankruptcy Code § 547. The district court concluded that there was insufficient evidence relating to the value of the funeral home assets at the date of bankruptcy. The district court upheld the second bankruptcy court order insofar as it set aside the 1982 transfers as fraudulent under Bankruptcy Code § 548(a)(1), on the strength of the bankruptcy court's finding that the 1982 trans-

---

7. Given the funeral home's meager $50,000 net annual cash flow, without continued debenture sales it would have been impossible for EMB even to maintain the new ADB loan repayment schedule once the monthly payment rose to $7,000, to say nothing of meeting its ongoing interest and principal obligations to debenture holders. ADB does not contend that there was any reason to believe that the funeral home could generate operating revenues sufficient to meet its loan repayments, let alone meet its debenture obligations.

fers were actually intended to hinder and delay debenture holders. After setting aside the 1982 transfers as fraudulent, the district court correctly concluded that the funeral home assets nonetheless remained encumbered by ADB's 1980 refinancing liens. The district court then utilized Bankruptcy Code § 510(c)(1) to subordinate ADB's "claim" to the unsecured claims of post–1977 debenture holders and ordered ADB's 1980 refinancing liens transferred to the debtor estates pursuant to Bankruptcy Code § 510(c)(2).

ADB contends on appeal that the district court erroneously upheld the second bankruptcy court order setting aside the 1982 transfers as fraudulent under Bankruptcy Code § 548(a)(1), because the second bankruptcy court order was predicated on an impermissible use of Bankruptcy Code § 510(c) to avoid ADB's 1980 refinancing liens on equitable grounds. ADB insists that Bankruptcy Code § 510(c) cannot be utilized to set aside the 1980 refinancing liens it acquired and perfected eight years earlier and "foreclosed" upon six years earlier by means of the 1982 transfers "in lieu of foreclosure." ADB relies in part on the first district court opinion, which expressed reservations, without determining, whether Bankruptcy Code § 510(c) may be utilized as an avoidance device. ADB further contends that its relationship with the funeral home, and its conduct towards debenture holders, afforded insufficient grounds for equitable subordination. ADB argues that there is no evidence of actual reliance by any debenture holder on the false SFH tax returns and financial statements, and, furthermore, that no more than $45,487.82 of

the $1,854,000 raised through debenture sales could have gone to ADB.[8]

## II DISCUSSION

We need not address ADB's challenge to the district court ruling that the 1982 transfers from Dade and Bristol were fraudulent and voidable under Bankruptcy Code § 548(a)(1), as we conclude that the 1981 transfers from EMB/SFH to Dade and Bristol were voidable under Bankruptcy Code § 548(a)(1).[9] We further conclude that the funeral home assets ADB acquired in the 1982 transfers are recoverable for the benefit of the debtor estates under Bankruptcy Code § 550. Accordingly, we remand to permit the bankruptcy court to effect the recovery of all funeral home assets, or their value, see 11 U.S.C. § 550(a), from ADB, and for whatever further proceedings may be required to determine the allowability of any ADB claim which may be filed or pending, see id. § 502(d), and to determine whether any allowed claim of ADB should be equitably subordinated, see id. § 510(c)(1), to any other allowed claims, and, if so, whether ADB's 1980 refinancing liens should be transferred to the debtor estates pursuant to Bankruptcy Code § 510(c)(2).

*The 1981 Transfers to Dade and Bristol*

▆▆▆▆ ADB has conceded, and the bankruptcy court and the district court assumed, that the 1981 transfers to Dade and Bristol were a sham. Consequently, neither court undertook an analysis of the assumptively invalid 1981 transfers, but treated them as though they had never occurred.[10] We now examine the voidabili-

---

8. More precisely, ADB asserts that out of all of the payments it received from EMB, only $45,-487.82 was not traceable to money advanced to EMB by ADB.

9. Although the 1981 transfers were not directly challenged under Bankruptcy Code § 548(a)(1), ADB concedes that the 1981 transfers were a sham. Moreover, we are free to affirm the district court on any ground supported by the record. *See Norris v. Lumbermen's Mut. Cas. Co.,* 881 F.2d 1144, 1151–52 (1st Cir.1989) (quoting *Doe v. Anrig,* 728 F.2d 30, 32 (1st Cir.1984)).

10. At the close of the equitable subordination analysis in its first opinion, the bankruptcy

court *set aside* the 1981 transfers under Bankruptcy Code § 510(c) so as to relegate ADB's distributive rights against the debtor estates to a position inferior to the distributive position of post–1977 debenture claimants. Since Bankruptcy Code § 510(c) may not be employed to avoid a *transfer,* however, the use of principles of equitable subordination to avoid either the 1981 transfers or the 1982 transfers would exceed the powers conferred upon the bankruptcy courts by Bankruptcy Code § 510(c), which provides as follows:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and hearing, the court may—

ty of the 1981 transfers under Bankruptcy Code § 548(a)(1).

Bankruptcy Code § 548(a)(1) defines a voidable fraudulent transfer as—

any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted;

11 U.S.C. § 548(a)(1).

■ The transfer of any interest in the property of a debtor, within one year of the filing of a petition in bankruptcy, is voidable by the trustee in bankruptcy if the purpose of the transfer was to prevent creditors from obtaining satisfaction of their claims against the debtor by removing the property from their reach. *In re Warner*, 87 B.R. 199, 203 (Bankr.M.D.Fla. 1988) (construing § 548(a)(1)); *see also United States v. Fernon*, 640 F.2d 609, 613 (5th Cir.1981) (applying Florida's fraudulent conveyance statute); *cf. In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir.1986) (transfer with intent to place property beyond reach of a creditor constitutes transfer with intent to hinder, delay or defraud creditors under Bankruptcy Code § 727(a)(2)(A)).

It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors. Therefore, as is the case under the common law

of fraudulent conveyance, courts applying Bankruptcy Code § 548(a)(1) frequently infer fraudulent intent from the circumstances surrounding the transfer, *see, e.g., In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir.1983) (inferring fraudulent intent from redemption of majority shareholder's stock at inflated price), taking particular note of certain recognized indicia or badges of fraud, *see, e.g., In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir.1983); *In re Craig*, 92 B.R. 394, 400 (Bankr.D.Neb.1988).

■ Among the more common circumstantial indicia of fraudulent intent *at the time of the transfer* are: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; *In re Warner*, 87 B.R. at 202; *In re Fitzpatrick*, 73 B.R. 655, 657 (Bankr.W.D.Mo.), *aff'd in part and rev'd. in part on other grounds*, 60 B.R. 808 (W.D.Mo.1985); *In re Jones*, 68 B.R. 483, 486 (Bankr.W.D.Mo.1984); (4) a special relationship between the debtor and the transferee, *In re May*, 12 B.R. 618, 627 (N.D.Fla.1980) ("family, friendship, or close associate relationship"); *In re Fitzpatrick*, 73 B.R. at 657 (closer financial relationship between debtor and transferee than with other creditors); and, *after the transfer*, (5) retention by the debtor of the property involved in the putative transfer, *In re Jones*, 68 B.R. at 486 & n. 10.

■ The presence of a single badge of fraud may spur mere suspicion, *id.;* the confluence of several can constitute conclu-

---

(1) under principles of equitable subordination, *subordinate for purposes of distribution* all or part of an *allowed claim to* all or part of *another allowed claim* or all or part of an allowed interest to all or part of another allowed interest; or

(2) *order* that *any lien* securing *such a subordinated claim* be *transferred to the estate.* 11 U.S.C. § 510(c) (emphasis added). Subsection 510(c)(1) *only* empowers the bankruptcy court to "subordinate for purposes of distribution ... an allowed claim ... to another allowed claim...." Although a secured claim, as well as an unsecured claim, may be filed and "allowed," *see* Bankruptcy Code §§ 101(4), 501, 502, and an allowed secured claim may then be

equitably subordinated, under subsection 510(c)(1), to any other allowed claim, secured or unsecured, neither the "lien securing such a subordinated claim," nor the transfer which gave rise to the lien, can be *avoided* through recourse to subsection 510(c)(1).

Although subsection 510(c)(2) permits the bankruptcy court to "order that any lien securing *such a subordinated claim* [*i.e.,* an allowed claim subordinated under subsection 510(c)(1) ] be transferred to the estate," neither subsection 510(c)(1) nor (2) empowers *avoidance* of the lien or invalidation of the transfer which gave rise to the lien.

Bankruptcy Code § 510(c) is not an avoidance device for setting aside *liens* or *transfers.*

sive evidence of an actual intent to defraud, absent "significantly clear" evidence of a legitimate supervening purpose. *See In re Cushman Bakery*, 526 F.2d 23, 33 (1st Cir.1975) (applying Bankruptcy Act § 67d(2)(d)) (debtor's acquiescence in mortgage to lender's nominee so as to conceal possible preference, not fraudulent; lender's *contemporaneous advance of new consideration*, cash and credit, considered "entirely consistent with an intent [on part of debtor] to protect its creditor standing, to continue in business, and to rehabilitate itself financially"), *cert. denied sub nom. Agger v. Seaboard Allied Milling Corp.*, 425 U.S. 937, 96 S.Ct. 1670, 48 L.Ed.2d 178 (1976).

■ There was no legitimate supervening purpose for the 1981 transfers. The bankruptcy court expressly found, in the course of its equitable subordination analysis, that the 1981 transfers effected "a change in name only" for the *purpose* of placing "the [funeral home] property even further beyond the reach of the debenture holders, while preserving [Brier's] interests. . . ." Thus, the bankruptcy court found that the 1981 transfers were motivated by an actual intent to hinder, delay and defraud debenture holders. A finding of fraudulent intent is a finding of fact which we will not disturb absent clear error. *See Roco Corp.*, 701 F.2d at 981.

Unmistakable indicia of fraud abounded in the circumstances surrounding the 1981 transfers. The 1981 transfers were of the "lock, stock, and barrel" variety, purporting to convey all funeral home assets, real and personal, including name and good-will, to two entities entirely owned and controlled by a judgment creditor with whom the debtors had long had an intimate financial relationship.[11] The transfers were effected nine months before involuntary bankruptcy, while EMB and SFH were in desperate financial condition.[12] Although the parties styled the 1981 transfers as "purchases," the real estate "purchaser," Bristol, directed that the real estate transfer be effected without title evidence. We consider it particularly telling that the "purchasers'" express assumption of certain funeral home indebtedness omitted any mention of what was, by far, EMB/SFH's largest indebtedness—the debenture indebtedness.

The bankruptcy court supportably found that EMB and SFH were insolvent beginning in 1978, when their long-term indebtedness surpassed the $1,000,000 debt subordination threshold established in the 1973 loan agreement. At the time of the 1981 transfers, EMB and SFH were utterly unable even to *service* their debt, except by luring more financing from debenture holders for whom there was no prospect of repayment.

The bankruptcy court correctly found that the 1981 transfers were conveyances in name only and that Erwin Bosler continued to run the funeral home; selling debentures, signing checks and using all funeral

---

**11.** The 1981 transfers placed *all* funeral home assets in the hands of a longtime business associate, Roy Lehrer, who owned 100% of Dade and Bristol and who, along with Erwin Bosler and Robert Goldblatt, was one of the three founders and principals of EMB, and remained an EMB shareholder until 1980. After 1980, Bosler and Lehrer continued to work closely together. Beginning in 1981, Bosler operated the funeral home for Lehrer and continued to do so at the time the present adversary proceeding was commenced. The bankruptcy court supportably found that, beginning in 1981, Lehrer, Bosler and Brier acted in concert to advance their own interests at the expense of debenture holders.

**12.** Prior to the 1981 transfers, Roy Lehrer apparently had obtained judgment against EMB for $104,000. At the time of the 1981 transfers,

the judgment, with $8,948.60 in accrued interest, remained unsatisfied. In addition, EMB had defaulted on a $35,000 principal payment to the Estate of Harold Wylie, a debenture holder. The closing statement for the 1981 transfers reflected numerous other debts and encumbrances, including $235,334.34 in principal and interest on the Bank loan, $20,717.06 in accrued city taxes, and a $24,000 balance due on the Sugarman purchase money loan. The title certificate prepared at the time of the closing refers to other undischarged record encumbrances on the funeral home assets, including a $60,000 mortgage to Fourbro Company, a $75,000 mortgage to M & E Realty Co., Inc., and the $500,000 ADB mortgage. EMB's total indebtedness at the time of the 1981 transfers exceeded $1.8 million, including not less than $950,000 due debenture holders.

home assets as usual. As ADB concedes that the 1981 transfers to Dade and Bristol were a sham, and the bankruptcy court correctly concluded that the 1981 transfers were fraudulent and void, we affirm their avoidance under Bankruptcy Code § 548(a)(1).[13]

*Recovery of Funeral Home Assets from ADB*

■ Under Bankruptcy Code § 550(a)(1), property fraudulently transferred by the debtor may be recovered by the trustee in bankruptcy from, *inter alia,* "the initial transferee ... or the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). Bankruptcy Code § 550 provides in relevant part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... *548* ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in *good faith, and without knowledge of the voidability of the transfer* avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a) & (b) (emphasis added).

■ ADB was an entity for whose benefit the 1981 transfers to Dade and Bristol were made, just as it was the entity to which the 1982 transfers were made by Dade and Bristol. Alternatively, by virtue of the 1982 transfers "in lieu of foreclosure," ADB was the "immediate transferee ... of ... [the] initial transferee[s]," 11 U.S.C. § 550(a)(2), under the 1981 transfers, Dade and Bristol. Whether or not ADB acquired the funeral home assets from Dade and Bristol "for value," within the meaning of Bankruptcy Code § 550(b)(1), the record is replete with evidence that ADB, acting through Brier, was neither a "good faith transferee," under Bankruptcy Code § 550(b)(1) and (2),[14] nor was it "without knowledge of the voidabili-

---

**13.** Section 548(c) provides in relevant part that

a transferee or obligee of a transfer or obligation [voidable under section 548] that takes for value and in *good faith* has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c) (emphasis added). Under Bankruptcy Code § 548(c), Dade and Bristol would retain a lien on the funeral home assets, notwithstanding the avoidance of the 1981 transfers, to the extent they took for value and in *good faith*. However, as the bankruptcy court supportably found that Roy Lehrer was privy to the fraudulent purposes of the 1981 transfers, Dade and Bristol cannot qualify as "good faith" transferees. *See* 4 *Collier on Bankruptcy* ¶ 548.07 at 548.74 to 548.75 & n. 13 (15th ed. 1990) (citing cases).

**14.** The "good faith" test under Bankruptcy Code § 550(b) was custom-tailored to redress these abuses.

The phrase 'good faith' ... is intended to prevent a transferee from whom the trustee could recover [under § 550(a)(1)] from trans-

ferring the recoverable property to an innocent transferee, and receiving a retransfer from him, that is, 'washing' the transaction through an innocent third party. In order for the transferee to be excepted from liability under this paragraph [§ 550(b)], he himself must be a good faith transferee.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 376, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5963, 6332. S.Rep. No. 989, 95th Cong., 2d Sess. 90, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5876.

Thus, Bankruptcy Code § 550(b) places only "good faith" transferees beyond reach of the recovery powers conferred upon the trustee in bankruptcy by Bankruptcy Code § 550(a)(2). On the record developed before the bankruptcy court, there can be no doubt that the 1981 transfers and the 1982 transfers effected sham ("wash") transactions for the benefit of ADB. Thus, whether as the entity intended to be benefited by the 1981 transfers and the 1982 transfers, as a mediate or immediate transferee with knowledge of the voidability of the transfers, or as a transferee not acting in good faith, ADB must surrender the funeral home assets under Bankruptcy Code § 550(a)(1) or Bankruptcy Code § 550(a)(2).

ty of the [1981] transfer[s]," under Bankruptcy Code § 550(b)(1).

The bankruptcy court found that Alan Brier had contemporaneous knowledge of the nature and scope of the 1981 transfers, the relationship between Bosler and Lehrer, and Bosler's continuing management of the funeral home operation following the 1981 transfers. Brier likewise was well aware of the funeral home's unmanageable indebtedness and the likelihood of bankruptcy, as well as Bosler's intention to shield funeral home assets from debenture holders. Thus, in the egregious circumstances disclosed by the present record, based on the well-supported findings of the bankruptcy court, there can be no doubt that Brier, hence, by imputation, ADB, had "knowledge of [the] voidability" of the 1981 Transfers.[15]

Accordingly, under Bankruptcy Code § 550(a)(1) the trustee in bankruptcy is entitled to recover from ADB, for the benefit of the debtor estates, all funeral home real and personal property conveyed to Dade and Bristol in the 1981 transfers and back to ADB in the 1982 transfers, or, if the court so orders, the value of such property.

*Bankruptcy Code § 502*

█ It cannot be determined from the record on appeal whether ADB filed a proof of claim against EMB/SFH.[16] In the event a proof of claim has been filed in accordance with Bankruptcy Code §§ 501 & 502(a) and Bankruptcy Rules 3002 & 5005, it nonetheless must be disallowed, at the present juncture, as the claim of an entity from which property is recoverable under section 550, until ADB pays the amount, or turns over the property, for which it is liable under section 550. *See* 11 U.S.C. § 502(d).[17] On the other hand, if ADB has not yet done so, it may file a proof of claim, pursuant to Bankruptcy Code §§ 501(d) and 502(h), upon compliance with the payment or turnover order of the bankruptcy court.

## III CONCLUSION

In either event, once a proof of claim has been filed and the section 550 payment or turnover order has been complied with by ADB, unless objected to pursuant to Bankruptcy Code § 502(a) the ADB claim may be allowed or disallowed, as appropriate, in whole or in part, *see* 11 U.S.C. § 550(d)(1), as a secured claim or an unsecured claim, and, "after notice and hearing," the bankruptcy court may determine whether any allowed claim of ADB should be subordinated to any other allowed claim, under the principles of equitable subordination, *see id.* § 510(c)(1), and whether any lien securing any such subordinated claim should be transferred to the estate, *see id.* § 510(c)(2). The bankruptcy court may conduct such further proceedings in the pending adversary proceedings between these parties as may be required to resolve

---

**15.** We need not determine whether some lesser fund of knowledge, actual or constructive, *see, e.g., In re Mixon*, 788 F.2d 229, 232 (4th Cir. 1986) ("knowledge," under § 550(b)(1), does not include "constructive notice"), would suffice under Bankruptcy Code § 550(a)(2) & (b)(1), as ADB, through Brier, had actual knowledge of all facts and circumstances supporting the determination that EMB intended to hinder, delay and defraud debenture holders. "Knowledge of voidability" does not require "complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do." *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 898 (7th Cir.1988).

**16.** Only an "allowed claim" (or an "allowed interest") may be subjected to equitable subordination under Bankruptcy Code § 510(c). Unless a claim has been filed it may not be allowed. 11 U.S.C. §§ 501, 502(a); Bankruptcy Rules 3002, 3005. Of course, if a proof of claim is filed but the claim is disallowed, the principles of equitable subordination never come into play. Disallowance means there is no debt owed by the estate, which moots any legal or equitable issue as to the holder's distributive rights in the assets of the estate. *See generally* 3 *Collier on Bankruptcy* ¶ 510.02 (15th ed. 1988).

**17.** Bankruptcy Code § 502(d) states in relevant part that—

(d) Notwithstanding subsections (a) and (b) of this section, the court *shall disallow any claim of any entity from which property is recoverable under section ... 550 ...* of this title *or that is a transferee of a transfer avoidable under section ... 548 ...* of this title, *unless such entity or transferee has paid the amount, or turned over any such property,* for which such entity or transferee is liable under section ... 550 ... of this title.

11 U.S.C. § 502(d) (emphasis added).

any issue arising under Bankruptcy Code § 510(c), or otherwise, as appropriate and consistent with this opinion, without restriction upon its power to base any equitable subordination determination, in whole or in part, on the record made earlier in these adversary proceedings.

*Accordingly, we vacate the district court judgment subordinating ADB's 1980 refinancing liens on the funeral home assets to post–1977 debenture claims and remand to the bankruptcy court with directions to set aside the fraudulent 1981 transfers, to order turnover by ADB of the funeral home assets, or payment of their value, for the benefit of the debtor estates, and to conduct such further proceedings as may be appropriate to resolve the allowability of any proof of claim, and the order of distribution on any allowed claim, of ADB.*