In re MAINE POLY, INC., Debtor.

John C. Turner, Trustee, Plaintiff,

v.

JPB Enterprises, Inc., Jean Paul Bolduc, Bertrand Bolduc, James R. Bolduc, and Richard Todd, Defendants.

Bankruptcy No. 01–21125.
Adversary No. 03–2122.

United States Bankruptcy Court, D. Maine.

Nov. 4, 2004.

Jonathan R. Doolittle, Dylan Smith, Verrill & Dana, Portland, ME, for Plaintiff.

George J. Marcus, Lee H. Bals, Marcus, Clegg & Mistretta, Portland, ME, for Defendant.

## Memorandum of Decision

JAMES B. HAINES, JR., Bankruptcy Judge.

Before me is the plaintiff's motion seeking summary judgment on counts two, three, four, and six of his eight-count complaint, and partial summary judgment on counts seven and eight. The defendants have cross-moved, seeking summary judgment on counts one through six. For the reasons set forth below, the plaintiff's motion will be denied. Defendants' cross motion will be granted with respect to Counts one and two of the complaint, and denied with respect to all other counts.[1]

### Facts [2]

Maine Poly, Inc., a manufacturer of flexible packaging products, filed for chapter 7 relief on July 11, 2001. Defendant JPB Enterprises, Inc. (JPBE) is an investment firm located in Maryland and owned by defendant J.P. Bolduc and his wife. JPBE owns 100% of the stock of Maine Poly. The individual defendants include J.P. Bolduc, the president of JPBE; Bert Bolduc, J.P.'s brother; James Bolduc, J.P.'s son and a vice president of JPBE; and Richard Todd, CFO and vice president of JPBE.

JPBE purchased 80% of the stock of Maine Poly in June 1998, from Robert Ray and Robert Neal, for $3.15 million.[3] Eight hundred thousand dollars was paid in cash.

---

1. This memorandum sets forth the court's conclusions of law in accordance with Fed. R. Bankr.P. 7056. Unless otherwise indicated, references to statutory sections or to the "Bankruptcy Code" or "Code" refer to the Bankruptcy Reform Act of 1978, 11 U.S.C. § 101, et seq., as amended.

2. As part of their competing motions for summary judgment, and in compliance with local summary judgment practice, each party has filed a statement of material facts supporting its position and opposing its opponent's. Unless otherwise noted, only agreed facts are recited below.

3. JPBE purchased all of Ray's stock and 60% of Neal's stock.

The balance came in the form of promissory notes from JPBE to Ray and Neal. Following the sale, J.P. Bolduc, Richard Todd, and James Bolduc joined the Maine Poly board of directors, with J.P. Bolduc serving as its chair.

Both before and after the sale, Maine Poly drew its working capital from a $5 million revolving line of credit with Textron Financial Corp.[4] The Textron line of credit was secured in part by a guaranty of $1.5 million from Maine Poly's owners. Upon sale, JPBE guarantied $1.2 million of the Textron debt. Neal remained obligated to the extent of $300,000 on his guaranty, but Ray's guaranty was discharged. At the same time, JPBE and Maine Poly entered into a "Letter of Agreement," pursuant to which Maine Poly paid JPBE a $75,000 "transaction fee" and agreed to pay JPBE a monthly "management fee" of 1.5% of net invoiced sales. Maine Poly paid the management fees to JPBE until December 1999, when JPBE installed Bert Bolduc as Maine Poly's president. He ordered that the payments cease.

The parties agree that, beginning shortly after the sale, Maine Poly suffered cash flow problems. They also agree rising raw materials costs and the bankruptcy of several customers contributed substantially to the cash flow problem. In March 2000, Textron granted Maine Poly a $250,000 over-advance. In May 2000, Textron extended the company a 1-year $500,000 term loan, half of which paid off the March over-advance. As a condition of the term loan, JPBE was required to increase its guaranty of Maine Poly debt from $1.2 million to $1.7 million, but the parties agreed JPBE's guaranty would be reduced to $1.2 million upon the term loan's payment. Over the course of its ownership, JPBE contributed cash to Maine Poly. JPBE contends those cash infusions totaled approximately $2 million by the date of the bankruptcy filing.

In mid–2000, Maine Poly decided to sell its electrostatic division ("ESD") to raise cash. Ultimately, it agreed to sell it to Pure–Stat, a company formed by Ray and Neal. The structure of this sale transaction is hotly disputed. The trustee contends that the sale price for the ESD assets was at least $2.129 million, disbursed (substantially) as follows: $280,000 to pay off the remaining balance of the Textron term loan, $600,000 to reduce the balance of the Textron line of credit, $254,000 to Maine Poly, and the balance of $791,000 directly to JPBE. The defendants contend that the transaction was a three-party deal and that the consideration paid to JPBE ($791,000) was given in return for two agreements not to compete with Pure–Stat, and to obtain Neal's release from his enduring $300,000 guaranty obligation to Textron.

### Discussion

#### Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Rosenberg v. City of Everett*, 328 F.3d 12, 17 (1st Cir.2003).

The role of summary judgment is to look behind the facade erected by the pleadings and assay the parties' proof in order to determine whether a trial will serve any useful purpose. Conventional summary judgment practice requires

---

4. Textron was secured by a first priority lien in inventory and accounts receivable, a second priority lien in machinery and equipment, and a third priority lien in real estate.

the moving party to assert the absence of a genuine issue of material fact and then support that assertion by affidavits, admissions, or other materials of evidentiary quality. Once the movant has done its part, the burden shifts to the summary judgment target to demonstrate that a trialworthy issue exists....

In conducting this tamisage, the ... court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor. This standard is notoriously liberal—but its liberality does not relieve the nonmovant of the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe. Moreover, the factual conflicts relied upon by the nonmovant must be both genuine and material. For this purpose, "genuine" means that the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party, and "material" means that the fact is one that might affect the outcome of the suit under the applicable law.

*Mulvihill v. Top–Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir.2003) (citations omitted).

### What the Plaintiff Seeks

Although Turner's motion addresses many counts,[5] and articulates alternative grounds for recovery, his initiative boils down to an attempt to recover from the owner and managers of Maine Poly funds they received in three transactions: (i) $775,000 of debt forgiveness received by JPBE from partners Ray and Neal in connection with Maine Poly's sale of ESD to Pure Stat in February 2001;[6] (ii) the so-called "transaction fee" and "management fee" payments made by Maine Poly to JPBE under the 1998 Letter of Agreement; and (iii) payments made to Textron that eliminated $500,000 of JPBE's guaranty obligations.

#### 1. The ESD Sale.

Maine Poly agreed to sell the ESD assets to Pure–Stat for $1.875 million, plus an amount to be determined for inventory. The initial terms, set forth in a letter dated November 14, 2000, set the total purchase price at $2,284,001, to be distributed as follows:

| | |
|---|---|
| Cash (to Maine Poly) | $1,500,000.00 |
| Forgiveness of debt owed by JPBE to Buyer (Neal) | $ 375,000.00 |
| 20% Ownership of Maine Poly (to be transferred from Buyer (Neal) to JPBE) | $ 1.00 |
| Purchase of Inventory (cash to Maine Poly) (estimated value at closing) | $ 409,000.00 |
| Total | $2,284,001.00 |

5. Count II of the complaint seeks to recover from JPBE the amount by which its guaranty liability was reduced by certain payments made to Textron, under the Maine Uniform Fraudulent Transfer Act ("UFTA"). Count III seeks a declaration that the Letter of Agreement is void under Maine law and the payments made thereunder are recoverable by the trustee. Count IV seeks recovery of allegedly fraudulent transfers made in connection with the ESD sale, the Letter of Agreement, and certain Textron payments. Count VI seeks recovery under the Bankruptcy Code for allegedly fraudulent transfers made within one year prior to the bankruptcy filing. Count VII is a breach of fiduciary duty claim against the individual defendants, and Count VIII is essentially a claims objection.

6. JPBE actually received consideration in the approximate amount of $791,000, consisting of $775,000 in debt forgiveness by Ray and Neal and the payment by Maine Poly of JPBE's legal fees ($16,000) in connection with the ESD sale. For simplicity sake, and because the analysis is identical, I will refer generally to the transfer as the debt forgiveness of $775,000.

A second letter was dated December 22, 2000, and executed by the parties after Ray and Neal determined that they could finance no more than $1.1 million for the deal. It altered the terms as follows:

| | |
|---|---|
| Cash (to Maine Poly) | $1.1 million |
| Forgiveness of debt owed by JPBE to Buyer (Neal) | $ 375,000.00 |
| Forgiveness of debt owed by JPBE to Buyer (Ray) | $ 400,000.00 |
| 20% Ownership of Maine Poly (to be transferred from Buyer (Neal) to JPBE) | [no value assigned] |
| Purchase of Usable Inventory (cash to Maine Poly) (estimated value at closing) | $ 409,000.00 |
| Total | $2,284,000.00 |

As consummated, the sale closely tracked the December 22 terms. Turner asserts that, from the beginning, the essence of the deal was a sale of the ESD assets (fixed assets, patents and trademarks, and inventory) for the price of $2.284 million. To the extent Maine Poly received less than that sum, he considers the defendants shortchanged the company. He contends that, rather than being forgiven, the notes from JPBE to Ray and Neal should have been assigned to Maine Poly. JPBE, not Maine Poly, benefitted by the debt forgiveness, although the consideration for that value was Maine Poly assets. Thus, the transaction constituted a fraudulent transfer of a portion of the purchase price to JPBE. Alternatively, Turner argues that, as directors of Maine Poly, the individual defendants are liable for breaching their fiduciary duties in allowing JPBE to siphon off part of the purchase price.

The defendants attack Turner's claims on several fronts. First, they argue that Maine Poly received reasonably equivalent value for the ESD assets; that JPBE's receipt of value is of no moment. It is not a requirement of fraudulent transfer law that the transferor receive *all* value from a transaction, they assert, only that it receive reasonably equivalent value. They have proffered expert opinion that the ESD assets were worth $827,000 in a liquidation, and $1.35 million as a going concern. The defendants also contend that JPBE independently gave valuable consideration to Ray and Neal for the debt cancellation: namely, non-compete agreements from JPBE, and J.P. Bolduc's assumption of Neal's remaining $300,00 exposure on the Textron guaranty. Moreover, they say there was no "transfer" at all within the meaning of the Uniform Fraudulent Transfer Act (UFTA) because the only assets conveyed were fully encumbered by valid liens. Finally, defendants assert that because there was no fraudulent transfer, they breached no duty to Maine Poly for consummating the ESD asset sale.

### A. *UFTA and § 548.*

Maine's version of the Uniform Fraudulent Transfer Act provides that the following transfers are deemed fraudulent as to existing and subsequent creditors:

**1. Fraudulent transfer.** A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

**A.** With actual intent to hinder, delay or defraud any creditor of the debtor; or

**B.** Without receiving a reasonably equivalent value in exchange for the transfer or obligations and the debtor:

(1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in re-

lation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as the debts became due.

14 M.R.S.A. § 3575(1). As to transfers made within one year before bankruptcy, the Bankruptcy Code provides the trustee with a cause of action substantially similar to that provided by state law:

**§ 548. Fraudulent transfers and obligations.**

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debt-

or was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548. The ESD asset sale took place within one year of Maine Poly's bankruptcy petition. Thus, both § 548 and state law provide grounds for avoidance.[7] Turner seeks to avoid the transfer of $775,000 to JPBE under both: He asserts the transfers were either made with "actual intent to delay, hinder or defraud creditors" under 14 M.R.S.A. § 3575(1)(A) and § 548(a)(1)(A), or they were "constructively fraudulent" under 14 M.R.S.A. § 3575(1)(B) and § 548(a)(1)(B).

*1. Actual Intent.*

 "It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors." *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1254 (1st Cir.1991). Fraudulent intent most often must be inferred "from the circumstances surrounding the transfer." *Id.* "In determining whether the circumstantial evidence supports an inference of fraudulent intent, courts should look to the existence of certain badges of fraud." *Dionne v. Keating (In re XYZ Options, Inc.),* 154 F.3d 1262, 1271 (11th Cir.1998). *Max Sugarman* identified the following common "circumstantial indicia of fraudulent intent *at the time of the transfer* ...: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable

---

7. Section 544(b)(1) of the Bankruptcy Code provides that:

[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is

voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, *after the transfer*, (5) retention by the debtor of the property involved in the putative transfer." *Max Sugarman Funeral Home, Inc.*, 926 F.2d at 1254 (citations omitted); *see also* 14 M.R.S.A. § 3575(2) (listing factors that may be considered in determination of actual intent); *In re XYZ Options, Inc.*, 154 F.3d at 1272 (listing of 11 badges of fraud).

■ Turner has produced evidence that pins several badges of fraud on the ESD asset sale (insolvency/unmanageable debt, special relationship). At the same time, the defendants have proffered evidence that, in answer to Maine Poly's financial difficulties, JPBE pumped approximately $2 million into the company, that the value Maine Poly actually received approximated the value of the ESD assets, and that JPBE independently gave consideration to the purchaser. On the summary judgment record, where I must credit the facts in the light most favorable to the non-moving party, *Calero–Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 12 (1st Cir.2004), I cannot conclude as a matter of law, under either Maine's UFTA or § 548, that JPBE's receipt of $775,000 in debt cancellation as part of the ESD asset sale was effected with *actual intent* to hinder, delay, or defraud creditors.

### 2. Constructive Fraud.

■ For Turner to succeed in his action under § 548(a)(1)(B), he must show that "(1) a transfer was made, (2) the transferred property belonged to the debtor, (3) the transfer was made within one year prior to the filing of the petition, (4) the transfer was made for less than equivalent value, and (5) at a time the debtor was insolvent or was made insolvent by the transfer." *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 440

(Bankr.N.D.Ill.1995) (*citing McKeever v. McClandon (In re McKeever)*, 132 B.R. 996, 1008 (Bankr.N.D.Ill.1991)); *see also Miner v. Bay Bank & Trust Co. (In re Miner)*, 185 B.R. 362, 365 (N.D.Fla.1995), *aff'd*, 83 F.3d 436 (11th Cir.1996); *Tomsic v. Pitocchelli (In re Tri–Star Techs. Co.)*, 260 B.R. 319, 323 (Bankr.D.Mass.2001) (listing elements of constructively fraudulent transfer, and noting that plaintiff bears the burden of proof as to each). The elements of constructive fraud under Maine's UFTA, 14 M.R.S.A. § 3575(1)(B), are substantially similar, although not textually identical.

■ Under either state or federal law, Turner is required to show that Maine Poly received less than "reasonably equivalent value" in exchange for its assets. At this, defendants take square aim. They have proffered expert testimony that the value of the ESD assets approximated what Maine Poly received for them. They describe the sale as involving three parties and two separate, but linked, transactions. In their view, the "hard assets" (*i.e.*, Maine Poly's ESD assets) sold to Pure–Stat included inventory, equipment, intellectual property, and other intangible assets. They were sold for $1.1 million, plus another $254,391.32 for inventory. At the same time, J.P. Bolduc and JPBE "sold" to Pure–Stat/Ray and Neal their non-compete agreements, as well as a release of Neal from his remaining Textron guaranty obligations. Under this line of reasoning, it doesn't matter that JPBE received something out of the transaction because Maine Poly got what it was entitled to get: reasonably equivalent value for the assets *it sold*.

Turner argues with significant force that it is simply impossible to credit the defendants' version of the transaction. In support, he has adduced the following facts: (1) Pure–Stat initially offered the full purchase price of approximately $2.2 million

to buy the ESD assets, without any mention of a non-compete from Bolduc or JPBE; (2) JPBE's internal memos initially described the deal as including $1.5 million cash and $375,000 in debt forgiveness for the assets, with no mention of a non-compete from Bolduc or JPBE; (3) the debt forgiveness went from $375,000 to $775,000 *only after* Neal and Ray found they could not secure the full $1.5 million in financing they originally proposed, not in reaction to any discussion of a non-competition agreement or guaranty release; (4) there is no documented mention of JPBE or Bolduc providing a non-competition agreement until the drafting stages of the deal, and the total consideration did not change when the agreement was added to the mix; (5) the operative agreement of sale between the parties expressly defines the transaction as including the $775,000 in debt cancellation as part of the purchase price, to be exchanged for certain listed assets, not including a non-competition agreement; (6) JPBE did not report the debt forgiveness as income, but rather as a reduction of its capital investment in Maine Poly; (7) Maine Poly did record the debt forgiveness as income, despite not having received any

proceeds; and (8) the net result of the ESD sale was to reduce JPBE's Textron guaranty obligation by $200,000, a reduction that would not likely require additional consideration.

What is in dispute here is not so much the *value* of the assets themselves, but rather which assets the buyers were buying, and with what funds.[8] Turner's theory isn't that the purchase price agreed upon by the parties to the sale was inadequate, it is that Maine Poly didn't receive that price. It received $775,000 less. Turner may ultimately prove a fraudulent transfer (depending on values) or may prove someone's breach of duty to Maine Poly (depending on the true parameters of the deal). Turner has produced compelling evidence that something is amiss and that what's "amissing" from Maine Poly's coffers found its way into the defendants' pockets. The defendants have their explanations, and have proffered trial-worthy evidence in support of them. This factual dispute demands trial.

### 2. The Management Fees.

JPBE entered into a Letter of Agreement with Maine Poly in June 1998, just as

---

**8.** On a convergent tack, the defendants dispute that a "transfer" within the meaning of the UFTA took place at all. Under the UFTA, "transfer" means disposing of or parting with an "asset." 14 M.R.S.A. § 3572(12). An "asset" is property of a debtor, but does not include property "to the extent that it is encumbered by a valid lien." 14 M.R.S.A. § 3572(2)(A). So, a transfer can occur under UFTA only to the extent unencumbered value is conveyed. *Fleet Nat'l Bank v. Valente (In re Valente)*, 360 F.3d 256, 260 (1st Cir.2004) (property worth $150,000 and encumbered by $168,000 first mortgage was not "asset" under UFTA); *Achille Bayart & Cie v. Crowe*, 238 F.3d 44, 47 (1st Cir.2001) ("To recover under the Maine UFTA, a plaintiff must prove that there was some determinable amount of value in the assets of the debtor over and above the amount of the secured debt."); *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124

F.3d 252, 262 (1st Cir.1997) (plaintiff failed to establish that fair value of transferred assets exceeded amount due secured creditor and therefore as a matter of law no "transfer" under Rhode Island UFTA occurred).

The summary judgment record reflects genuine disputes regarding the value of the ESD assets, the total value of Maine Poly's assets at the time of the sale, and the scope of the agreement between and among Pure–Stat, Ray, and Neal, on the one hand, and Maine Poly and JPBE on the other. It makes a messy stew. *Cf. Marquis Products, Inc. v. Conquest Carpet Mills, Inc. (In re Marquis Products, Inc.)*, 150 B.R. 487, 490–92 (Bankr. D.Me.1993) (three- or more-party transactions can complicate fraudulent transfer analysis). The evidence will ultimately prove out the parameters of the deal so that a disciplined application of pertinent state and federal law may be had.

JPBE took control of the company. The agreement, executed by Richard Todd on behalf of JPBE and by J.P. Bolduc on behalf of Maine Poly, contains the following terms:

JPBE will provide all due diligence services, document preparation, legal review, lender contact and negotiation and all other services required to consummate the [Maine Poly sale].

Ongoing JPBE will provide strategic and organizational planning and execution capabilities; operational experience with expertise in all functional areas of management ... business merger, acquisition and sales expertise; market/business/office /plant consolidation experience; public sector knowledge and experience (federal, state, and local government); and global knowledge and experience. Additionally, JPBE will make available to MPI the employees and management of other portfolio companies for additional guidance.

JPBE will remain involved in the operations of MPI, as it does with all portfolio companies. JPBE partners will monitor and assist company executives in defining roles, squeezing cash, growing sales and margins, and searching for new acquisition/investment opportunities.

With expertise in all areas of management, JPBE will appoint a "lead representative" to interface with MPI operating executives. The lead representative will review company results, consult with management on execution of an operating strategy and maintain relationships with lenders. To sustain ongoing involvement in the business, JPBE will perform their tasks on site whenever necessary.... In short, JPBE will provide whatever additional management capabilities are necessary to maximize returns on capital.

JPBE fees for the above services are as follows:

- An initial transaction fee of $75,000 to cover JPBE personals' [sic] time and out of pocket costs in regard to the acquisition;
- A ongoing [sic] monthly fee equal to 1.5% of net sales; and
- Reimbursement of ongoing actual out of pocket costs.

Pursuant to the Letter of Agreement, Maine Poly paid to JPBE (i) the $75,000 initial transaction fee, (ii) management fees of $162,544.67 in 1998, and (iii) management fees of $371,519.77 in 1999.

Following his appointment as president and chief executive officer of Maine Poly in January 2000, Bert Bolduc halted monthly management fee payments. He testified at deposition that he couldn't justify paying the fees because Maine Poly was short of cash and it was more important to spend limited resources on operations. He also testified the company's management was top-heavy, and needed restructuring. Finally, he testified that he didn't think ceasing the payments would result in losing JPBE's oversight and support because "as long as Maine Poly was an operating company of JPBE, there was a responsibility and an interest on the JPBE level to provide oversight to Maine Poly." JPBE, through Richard Todd, strenuously objected to Maine Poly's cessation of fee payments. However, there is evidence that JPBE actually increased its oversight of Maine Poly after payments ceased.

Turner argues that the 1998 Letter of Agreement is void under the Maine Business Corporation Act and therefore any payments made pursuant to the agreement must be returned. Alternatively, he asserts that the management fee payments made in 1999 were fraudulent transfers recoverable under 14 M.R.S.A. § 3575.

Defendants counter that the Letter of Agreement was "fair," thus not void, and that all payments made to JPBE under the Letter of Agreement were made with funds encumbered by liens and therefore not "transfers" for purposes of fraudulent transfer analysis.[9]

*a. Maine Business Corporation Act.*[10]

13–A M.R.S.A. § 717 states, in relevant part, as follows:

**§ 717. Transactions between corporations and directors and officers**

1. No transaction *in which a director or officer has a personal or adverse interest,* as defined in subsection 2, shall be void or voidable solely for this reason or solely because he is present at or participates in the meeting of the board, or of a committee thereof, which approves such transaction, or because his vote is counted, if

. . .

C. Although the requirements of paragraphs A and B have not been satisfied, the transaction is fair and equitable as to the corporation at the time it is authorized or approved, and *the party asserting the fairness of the transaction establishes its fairness.*

2. *A transaction in which a director or officer has a personal or adverse interest shall include*

. . .

B. *A contract or any other transaction between a corporation and any corporation, partnership or association in which one or more of its directors or officers are directors or offi-*cers or partners, or have a financial interest, direct or indirect . . . .

3. No contract or other transaction by a corporation *with any of its subsidiary, parent or affiliated corporations, or with another corporation in which there is a common director,* shall be void or voidable *solely* for this reason, if the contract or other transaction is fair and equitable as of the date it is authorized, approved or ratified. *The party asserting the unfairness of any such contract or transaction shall establish unfairness.*

(Emphasis added.)

The thrust of Turner's argument is that the Letter of Agreement is void under the provisions of 13–A M.R.S.A. § 717(1), because it constitutes a transaction in which three of the five members of the Maine Poly Board of Directors (namely, J.P. Bolduc, the majority owner of JPBE; James Bolduc, the son of JPBE's owners and a vice president of JPBE: and Richard Todd, a vice president and CFO of JPBE) had a "personal adverse interest," as expressly defined in § 717(2)(B), at the time the agreement was executed, and the agreement does not fit within one of the "safe harbors" of 13–A M.R.S.A. § 717(1)(A), (B), or (C).

Defendants argue that the trustee's attack comes under 13–A M.R.S.A. § 717(3), and that because Turner has not adduced specific evidence of unfairness and they have submitted evidence that the transaction was fair, they must prevail.

The parties quite rightly agree that the relevant inquiry is whether the agreement was fair and equitable to Maine Poly. If

---

9. *See* discussion *supra* n. 8.

10. Title 13–A of the Maine Revised Statutes has been repealed in its entirety, and replaced with Title 13–C, a revised Maine Business Corporation Act.2001 Me. Laws c. 640, § A–1. The parties agree that the repealed act gov-erns this dispute. *See* 2001 Me. Laws c. 640, § A–3(1) (repeal of Title 13–A does not generally affect title's operation or any action taken thereunder prior to the effective date of the repeal).

Turner's claim falls under 13–A M.R.S.A. § 717(1)(C), the defendants bear the burden of proving fairness. If it comes within 13–A M.R.S.A. § 717(3), Turner bears the burden. The burden of proof is critical.

■ I conclude that Turner's claim comes within 13–A M.R.S.A. § 717(1) and, therefore, that defendants bear the burden to prove the fairness and equity of the agreement. Although it is true that the Letter of Agreement was between a parent and its subsidiary, Turner does not seek to nullify it "solely" for that reason. Rather, he seeks to nullify it under 13–A M.R.S.A. § 717(1) because it was a transaction "in which a director or officer [had] a personal or adverse interest." Not every parent/subsidiary relationship includes overlapping officers and directors. Their presence takes the case out of 13–A M.R.S.A. § 717(3). If there were any doubt, 13–A M.R.S.A. § 717(2)(B) puts it to rest.

An inquiry into fairness and equity is necessarily fact-intensive. The defendants have submitted evidence, in the form of JPBE insiders' testimony, as to the fairness of the Letter of Agreement.[11] In turn, Turner notes that Maine Poly operated under different ownership, "for years" without a similar management structure. He points to the Letter of Agreement's "transaction fee" requirement as evidence of unfairness and stresses that the management fee's tie to net sales, profitable or not, could work unfairly for Maine Poly.

■ Taken alone, the transaction fee provision of the Letter of Agreement seems patently unfair to Maine Poly. It obligated Maine Poly to pay JPBE $75,000 for JPBE's expenses in purchasing 80% of Maine Poly's stock. The statute, however, does not permit me to sever the unfair from the fair within a single transaction. I must instead consider the entire agreement and all the evidence touching the issue whether it was fair and equitable as a whole. However skeptical of the agreement's overall fairness I am on this record, the issue must await trial.[12]

### b. Fraudulent Transfers under the Maine UFTA.

■ Turner argues alternatively that the monthly management fee payments paid in 1999 were fraudulent transfers. Turner limits his claim for management fee payments to 1999 (as opposed to payments made during 1998) because his expert has determined that the onset of sufficient financial distress to meet the requirements of Maine's UFTA commenced that year. *See* 14 M.R.S.A. § 3575(1)(B) (the debtor "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or [i]ntended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as the debts became due.").[13]

---

11. The defendants also stress the absence of any evidence of fraud or bad faith in the execution of the Letter of Agreement. Although evidence of fraud or bad faith might very well be telling, its absence is by no means fatal to Turner's case.

12. As with the ESD sale, the factual dispute precludes me from granting judgment to Turner on his breach of fiduciary claim against the individual defendants with regard the Letter of Agreement.

13. Because the monthly management fees were paid in 1999 (and before), at least eighteen months before bankruptcy, Turner's fraudulent transfer remedy under the Bankruptcy Code is limited to state law, made applicable by § 544(b).

Like the "fair and equitable" analysis required under the Maine Business Corporation Act, an analysis under the Maine UFTA requires me to determine whether, by JPBE's performance of the services required under the Letter of Agreement, Maine Poly got "reasonably equivalent value in exchange" for the payments. And like the outcome under the Business Corporation Act, I cannot conclude on this record there was not an exchange of reasonably equivalent value as a matter or law.

### 3. *The Textron Payments.*

 Finally, Turner seeks to recover from JPBE the amount of the payments made to Textron, to the extent those payments benefitted JPBE by reducing JPBE's guaranty obligations. Turner concedes that Textron was an oversecured creditor. Turner points to the Maine UFTA, which provides what is, essentially, an "insider preference" avoidance and recovery provision.

> **Transfer to insider.** A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

14 M.R.S.A. § 3576(2). Such transfers are "avoidable," 14 M.R.S.A. § 3578(1)(A), for up to six years after the transfer "occurred," 14 M.R.S.A. § 3577. *See* 14 M.R.S.A. § 752 (six year statute of limitations for civil actions).

The fatal problem with Turner's position is that Maine Poly's payments to Textron were all required under the applicable loan documents and made to a creditor that was at all times *oversecured.* Given that Textron held adequate security for its claims, paying down the obligation *decreased* the extent of its lien on Maine Poly's assets, potentially *benefitting* the company's unsecured creditors. Reduction of the defendant(s)' guaranty liability was an incidental consequence. One cannot say the payments represented a "transfer" to insiders.

### Conclusion

For the reasons set forth above, the defendants' motion for summary judgment is granted with respect to Counts I and II; and the plaintiff's motion for summary judgment is denied.