In re Thomas J. HEGARTY, Debtor.

Rose M. COGLIANO and Stephen E. Shamban, Trustee, Plaintiff,

v.

Thomas J. HEGARTY and Joseph R. Hegarty, Defendants.

Bankruptcy No. 93–14224–WCH. Adversary No. 93–1942.

United States Bankruptcy Court, D. Massachusetts.

April 21, 1997.

Robert J. Kerwin, Tarlow, Breed, Hart, Murphy & Rogers, P.C., Boston, MA, for Trustee.

Jonathan C. Lipson, Hill & Barlow, Boston, MA, for Joseph R. Hegarty.

Edward W. Vincent, Jr., Edgartown, MA, for Thomas J. Hegarty.

## DECISION

WILLIAM C. HILLMAN, Bankruptcy Judge.

### I. Introduction

Thomas J. Hegarty ("Thomas") filed a voluntary petition under Chapter 7 in this case on May 6, 1993. Rose M. Cogliano ("Cogliano"), Thomas' former wife and a creditor herein, and Stephen E. Shamban, the Chapter 7 trustee (the "Trustee") commenced this adversary proceeding against Thomas and his father, Joseph R. Hegarty ("Joseph"). They seek to set aside, for the benefit of the estate, the transfer of a beneficial interest in a trust on the grounds that it was a fraudulent transfer under 11 U.S.C. § 548, and to deny Thomas' discharge pursuant to 11 U.S.C. § 727(a)(2). Cogliano assigned her cause of action to the Trustee for the benefit of the estate.[1]

After trial I took the matter under advisement. The Trustee and Joseph filed posttrial memoranda which have not significantly assisted me in the determination of the issues posed.

This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(H). The following are my findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052.

### II. Findings of Fact

Buttonwood Farm Realty Trust (the "Trust") was created in 1983. It is the title holder of a two-acre property in West Tisbury, Massachusetts (the "Property"), which is improved by a house, a guest house, and a small barn. Thomas was the sole trustee of the Trust and he and his sister, Paula Sue Hegarty Ruckhaus ("Paula") were the beneficiaries, each holding a 50% beneficial interest.

In 1992 Thomas and Cogliano were married but engaged in a contested marital dispute in the Dukes County Probate Court.[2]

The Judgment of Divorce Nisi, dated September 16, 1992, provided in part that

> The real estate, with the buildings and appurtences [sic] thereon, located at Savages Path, West Tisbury, shall remain the property of [Thomas] and his sister ... as beneficiaries of Buttonwood Realty Trust. [Thomas] shall pay to [Cogliano] the sum of thirty five thousand eight hundred and thirty three ($35,833.00) dollars, within thirty (30) days hereafter, as part of the division of marital assets, including any interest in [the Trust].

On October 7, 1992, Justice Cronin of the Probate Court held Thomas in contempt for failure to comply with the judgment. He continued the hearing to October 21, 1992, subject to cancellation if payment were made by that time.

In October, 1992 (the day is left blank), Thomas filed his "Ex Parte Motion for Extension of Time" (the "Extension Motion") seeking an additional ninety (90) days to make the payment. He stated that

1. That he is without adequate funds at the present time to comply with this order;

2. *That he is presently in the process of refinancing the said property* to obtain the said $35,833.00 and expects to complete the refinancing within the said ninety (90) days;

3. The Plaintiff has no other sources of funds to satisfy this paragraph of the Judgment.

(Emphasis added).

On October 21, Justice Terry of the Probate Court granted the Extension Motion and extended the time for performance to November 30, 1992.

Thomas testified that in October, 1992, he had neither any funds to satisfy the obligation nor the ability to borrow on the basis of his own credit. He needed money to pay Cogliano. He owed $30,000 to his prior di-

---

1. In his post-trial memorandum Joseph contends that the assignment was never consummated. The docket, however, indicates that the assignment was sought by a motion filed November 20, 1996 (Docket No. 73) which I granted by an endorsement order on December 3, 1996.

2. The acrimony of the divorce carried over to this proceeding and infected trial counsel, whose actions frequently did not comport with appropriate levels of civility.

vorce counsel whom he testified he was then unable to pay.[3] The Trustee contends that his interest in the Property was Thomas' sole asset at the time of the transfer, but I find as a fact that he did have minor other assets at that time. The total of those assets, however, is minuscule compared to his then liabilities.

On October 22, 1992, the day after Justice Terry granted the Extension Motion, Thomas transferred his 50% beneficial interest in the Trust to Joseph. The assignment is memorialized in a document of that date, which does not indicate what, if any, consideration Joseph paid for the transfer.

At the time of the transfer of Thomas' beneficial interest, the Property was encumbered by a mortgage in the approximate amount of $82,500.00.[4] While Thomas had testified during the discovery process that he sold his interest to Joseph for about $35,-000.00, at trial he testified that the consideration received was about $120,000.00, on the theory that the subsequent refinancing relieved him of his personal liability (if any) on the Trust's mortgage. I find as a fact that the refinancing did not affect Thomas' personal liability to the mortgagee. Thomas signed the original mortgage only as trustee of the Trust. He was still trustee of the Trust at the time of the refinancing and signed the documents evidencing that loan in that capacity. Hence, if Thomas was, as his testimony implies, liable personally under the first note, a determination which I am unable to make because I lack the evidence which would prove or disprove that conclusion,[5] he remained liable when the second note was executed.[6]

Thomas' income tax return for 1992 contains as an attachment IRS Form 2119 entitled "Sale of Your Home". It reflects that on October 22, 1992, Thomas sold his home (not specifically identified on the tax return as the Property or otherwise) for $76,202. At trial he testified that he does not know how the preparer of his tax return, variously described as a "tax service" or "accountant", and as "she" or "them", determined that figure. There is no evidence that Thomas ever made an attempt to amend his tax return which, like a petition in bankruptcy, is signed under the penalties of perjury. When Thomas was called upon to testify by Joseph's counsel,[7] the following colloquy about the amount reported on the income tax return ensued:

Q. Can you tell me what you—whether you believe that is an accurate assessment of the value you actually received?

A. The value I actually received? Yeah. I mean, I'd have to agree other—I'd have to agree.

Q. Or do you think you might have received more value?

A. Given the circumstances, it would be more. I think it's—I don't think I could do any better. I don't think anyone could have done any better at the time. That's a very fair price for half interest in the trust.

Q. Well, remember, this is simply for income tax reporting.

A. Yeah, I'd have to say yes.[8]

Joseph testified that Thomas came to him and proposed that Joseph purchase Thomas' interest so that he could obtain funds needed because of a court order. Paula also asked Joseph if he could help out "to save it for the grandchildren."

---

3. Thomas appears to think it significant that he was not being pressed by creditors other than Cogliano and her counsel. From this he would have me infer that the other debts were not due. I decline to accept that interpretation.

4. The disbursement authorization for the refinancing mortgage discussed below indicates that the actual payoff was $82,222.45 on December 14, 1992.

5. See First Eastern Bank v. Jones, 413 Mass. 654, 602 N.E.2d 211 (1992); Apahouser Lock and Security Corp. v. Carvelli, 26 Mass.App.Ct. 385,

528 N.E.2d 133 (1988). The issue of the nature of the Trust is discussed infra.

6. Thomas has testified that Paula was the "main obligor" on the indebtedness but there is no basis for that assertion in any fact of record.

7. Thomas' counsel was present at trial but did not contribute by examination of witness or otherwise.

8. This unconvincing repartee should be contrasted with his responses to questions from the Trustee's counsel quoted below.

The Trust, acting through Thomas, immediately applied for a refinancing mortgage in the amount of $120,000.00, representing the value of the Property to be $295,000.[9] The loan application, entered into evidence, bears a notation "new $ to p.o. brothers ex wife." The handwriting of that notation appears to be that of the same person who endorsed the loan application as "approved" on November 2, 1992.

Joseph testified that neither he nor Paula participated in the loan application process or attended the closing. Thomas brought the papers to be signed to Joseph and they were mailed to Paula in Alaska for her execution.

The net proceeds of the Trust's refinancing of its mortgage were $35,591.55, which the parties have stipulated was paid to Thomas so that he might satisfy his obligation to Cogliano.[10]

I find as a fact that Thomas has resided in the Property continuously since approximately 1983 and his occupancy has not been affected by the transfer. His absences during high season periods when the property is rented are temporary and do not affect my conclusion.

Thomas treats the property as his own. He pays no cash rent to the Trust. He did testify that "he tried to put in at least a hundred" but this single statement was not supported by any documentation. I do not regard it as credible. Nor do I find any credible evidence of record to support his assertion that his free occupancy of the Property is in lieu of rent because of his management of the property. A typical exchange between Thomas and the Trustee's counsel is illustrative:

Q. Now you've mentioned in response to my brother's questions that you've paid rent all these many months, right, that you pay rent to the trust.

A. Attempted to, yes. And through my daily services and the management of the property, yes.

Q. What piece of paper can you show us that would indicate, apart from your testimony today, that you paid rent and you have—and you continue to pay rent?

A. It's just the deposits to the trust account, cancelled checks.

While Thomas made this assertion, no one ever directed my attention to any specific checks or the bank statements in evidence, or otherwise attempted to prove the payment of any cash rent. Thomas' testimony was unclear and unpersuasive.

Thomas resigned as trustee of the Trust by a document dated April 14, 1993, some months after the refinancing. The resignation, and Joseph's appointment as trustee, were recorded in the Dukes County Registry on April 16, 1993. On that same date the Trust opened a bank account and Thomas was given authority to sign checks.

He testified that his sister is presently living in Alaska; that his father does not participate in the management of the Property due to ill health; and that he pays the bills for the Trust.[11] Thomas is a very active former trustee.

The value of the Property at the time of transfer was the subject of conflicting evidence. In 1990, in the course of the divorce proceedings, Thomas had valued the property at $375,000. In May, 1992, an appraiser jointly retained by Cogliano and Thomas at the direction of the Probate Court, Shirley Ann Medeiros ("Medeiros"), valued the Property at $295,000.[12] Contradicting his valua-

---

9. Thomas testified that the valuation was set at the suggestion of the bank officer involved in the application process.

10. Thomas' check to Cogliano in the amount of $35,833 is dated December 12, 1992, which is prior to the disbursement of funds on the refinanced mortgage. On December 21, 1992 Cogliano filed a Complaint for Contempt against Thomas citing the nonpayment. From that fact I conclude that Thomas did not make payment until after the date of the last mentioned contempt complaint.

11. Joseph's testimony that Paula handles financial matters for the Trust is inconsistent with the documentary and other evidence and I decline to accept it as correct.

12. I find unconvincing Thomas' attempts in testimony to squirm out of the mutuality of the appraiser's appointment. At one point, under examination by Joseph's counsel, he admitted the choice had been by agreement of both counsel involved.

tion in the Probate Court, Thomas testified before me that the value in October 1992 was "somewhere in the vicinity of $200,000, 225 tops" but later testified that the upper limit was $250,000. He further contended that what he received for the transfer was "way beyond fair market value."

The Trustee called Medeiros as a witness. She has been a full time appraiser on Martha's Vineyard for twelve years and performs by her estimate about four hundred appraisals a year. She is a certified residential appraiser. When the Trustee retained her, she updated her May, 1992 Probate Court appraisal to October, 1992, and increased her determination of fair market value by $1,000 to $296,000. She testified further that Thomas' 50% interest in the Trust would be worth about fifty percent of the fair market value. Her ultimate conclusion was that, after deducting the standard six percent real estate broker's commission and the mortgage balance, Thomas' interest would be worth about $97,000. She declined to consider whether the form of title holding would affect value on the grounds that such a determination is not within the province of an appraiser.

Joseph called Catherine Elaine Ward ("Ward") as his appraiser. She is a certified general real estate appraiser whose experience in that field began in 1979. In her opinion, the fair market value of the Property in October, 1992 was $258,000, and the liquidation value $200,000, the latter based upon Thomas's need for a quick sale. Her comparable sales included one "OREO" property and one "swap" sale.

"OREO" is banker's shorthand for "other real estate owned ". It generally refers to properties which a lender has acquired by foreclosure and is offering for sale. OREO sales are commonly regarded as distress sales because the seller's motivation is to dispose of the property promptly. Ward testified that a "swap sale," where properties are exchanged, is not regarded as a fair market sale by the Appraisal Institute.[13] On

redirect she indicated that the stated sale price of the swapped parcel remained "an acceptable number."

Hobart Smith ("Smith"), a real estate broker who was not an appraiser, and who had listed the Property at one time, testified that he estimated the value of the Property in October 1992 at $250,000–275,000, based upon a six month marketing period. He had no experience in the valuation of partial interests in real estate.

As to the value of the Property, I find the Medeiros appraisal to be the more convincing. The weakness of the Ward comparables, two being other than traditional fair market sales, leads me to give less weight to her valuation. Smith's opinion was also at the higher end of the range. I find as a fact that the fair market value of the Property in October, 1992, was $285,000.

■ The next step would be to determine whether a 50% beneficial interest in the Trust has the same value as that fractional interest in the Property.[14] As will be seen, I need not make the ultimate valuation decision. Nevertheless, it is useful to demonstrate that I could not have done so if it had been required.

Valuation of partial interests in trusts appears to be a most uncommon undertaking for an appraiser. As noted, Medeiros and Smith declined to opine on the issue. Ward's testimony is best summarized by quoting from her appraisal:

> The trust is presumed to have the complete "bundle of rights" in the property, including the right to sell. In this case, however, the trust is comprised of two 50% interests. While in theory it is possible to sell a 50% interest in the trust on the open market, in fact, it would be very unlikely to find such a buyer. The most probable buyer would have to be the other 50% owner or another family member.

> Valuation of partial interests in property is typically done by discounting the partial

---

13. Her testimony was that she was not aware that the particular sale which she had used as a comparable was a swap sale.

14. Joseph testified that the half interest in the Trust which he purchased would be worth half of the value of the Property. His counsel espoused a contrary theory.

interest. There is no prescribed method of valuation of this type of interest and appraisers hold wide and varying opinions as to the proper methodology and/or discount factor. The only generally accepted consensus of opinion is that the estimated value is something less than 50% of the total estimated value. I have consulted with Mr. John E. Kline, MAI, of Hunneman Appraisal and Consulting Company, who advised me that it is common appraisal practice to discount a partial interest an additional 25% to 40% to reflect the nonliquid aspect of the partial interest in the trust. He concurred that it would be most unlikely to find a buyer for a partial interest in a residential trust who was not related in some manner to the other 50% owner.

Therefore, it is my opinion that the estimated market value of Mr. Thomas J. Hegarty's 50% interest in the trust ranged from $60,000 to $75,000 based upon his need to liquidate his interest within 30-45 days.

On re-cross examination Ward agreed with a statement in an Appraisal Institute publication that "due to lack of pertinent market transactions, valuations of co-ownerships are often somewhat subjective." She said she assumed that Paula would not be willing to sell her interest, but she had never spoken to Paula or otherwise attempted to ascertain her views. She assumed that Paula would be neutral with regard to a sale of Thomas' interest.

While it is certainly competent, and helpful, for Ward to disclose the information upon which she based her opinion, Fed.R.Evid. 705, in this case it discloses not her opinion but that of another, who did not testify at all. As a result, I find her conclusion without weight, leaving me with no credible evidence of the value of the beneficial interest.

There is a further gap in the evidence presented. No party offered into evidence the documentation creating or controlling the Trust. As a result, I do not know whether the Trust is a trust controlled by its trustee; a nominee trust where the trustee can act only as directed by the beneficiaries; or something differing from both of these alternatives. It might be that the trust documentation gave Thomas full power to dispose of all interests in the Property; it might give the other beneficiary a veto over any sale; it might do something between these extremes. Thomas' power to control the transfer of the Trust *res* is a critical factor in setting a value for his interest in the Trust, as opposed to his interest in the Property.

As a result of the failures of proof, I find insufficient evidence upon which I could make a determination of the value of Thomas' interest in the Trust. I can conclude, however, without quantifying it, that it has some value, and it is not necessary that I go beyond that point.

### III. Discussion

#### A. Actual Fraud

■ The Trustee's first and primary argument is that the transfer of Thomas' interest in the Trust constituted actual fraud as defined in 11 U.S.C. § 548(a)(1).[15]

It is not disputed that Thomas voluntarily transferred an interest in property within one year before the date of the filing of the original petition in this case. The remaining issue is whether the transfer of the beneficial interest in the Trust was made with actual intent to hinder, delay, or defraud. A brief resume of the factual findings is helpful.

Thomas was required by a court judgment to pay certain sums to Cogliano, primarily to satisfy her claim to the Property, so that it could "remain the property of [Thomas] and his sister ... as beneficiaries of [the] Trust". He did not have the money. Contempt proceedings were commenced and resulted in a judgment against him. He sought and obtained an extension of time to pay because he

---

15. "(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor has or became, on or after the date that such transfer was made or such obligation was incurred, indebted...."

was in the "process of refinancing", not selling, the Property. As trustee of the Trust he caused the mortgage on the Property to be refinanced and used the net proceeds to satisfy his obligation to Cogliano.

This summary demonstrates that the assignment of the beneficial interest had nothing to do with the receipt of funds to pay the judgment. Thomas had undertaken to refinance the Property to make the payment and he did so.

Where, then, does the transfer of the beneficial interest come into the story? It is the subject of the next chapter in the continuing saga, which might be entitled, based upon the evidence, as "Saving the Property for the Grandchildren."

I find that Thomas received no consideration for the transfer of the beneficial interest and that the only motive shown, keeping the Property in the family, was being facilitated by a transfer that at a minimum would hinder Thomas' creditors in general, and Cogliano in particular, from reaching the Property.[16]

For further guidance, I turn to the controlling decision of the First Circuit Court of Appeals, *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248 (1st Cir.1991):

> It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors. Therefore, as is the case under the common law of fraudulent conveyance, courts applying Bankruptcy Code § 548(a)(1) frequently infer fraudulent intent from the circumstances surrounding the transfer ... taking particular note of certain recognized indicia or badges of fraud....
>
> Among the more common circumstantial indicia of fraudulent intent at the time of the transfer are (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship be-

tween the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer.

> The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent "significantly clear" evidence of a legitimate supervening purpose.

926 F.2d at 1254–1255 (citations omitted).

Applying the template of indicia cited by the Court of Appeals to the facts of the present case we find a close match:

*(1) Actual or threatened litigation against the debtor.*

The divorce litigation was indeed actual and had resulted in the equivalent of a money judgment against Thomas which he was unable to pay.

*(2) A purported transfer of all or substantially all of the debtor's property.*

While I have found as a fact that Thomas owned some property other than his interest in the Trust, the latter certainly represented substantially all of his assets.

*(3) Insolvency or other unmanageable indebtedness on the part of the debtor.*

I find that Thomas was insolvent at the time of the transfer of his beneficial interest in the Trust to Joseph. Thomas' attempts to cast some doubt on this conclusion were unconvincing and incredible. He was, in brief, a witness whose testimony on many points was contrived and not credible. It was obvious that he had assimilated sufficient knowledge in the course of his various encounters with the legal system to understand when obfuscation of the truth would be helpful to his cause. His vain and manipulative attempts illustrate the wisdom of Alexander Pope's line about "a little learning."

---

**16.** Thomas has other ongoing obligations to Cogliano and his children under the divorce judgment.

*(4) A special relationship between the debtor and the transferee.*

The transferee was Thomas' father, Joseph.

*(5) Retention by the debtor of the property involved in the putative transfer.*

I have found as a fact that nothing changed with regard to Thomas' use of the Property as a result of the transfer of his beneficial interest. *See Twyne's Case*, 3 Coke 80b, 70 Eng.Rep. 809 (Star Chamber 1601) (transferor continued in possession of sheep "and used them as his own").

I conclude that the existence of these facts constitutes evidence of an actual intent to defraud. Since Thomas introduced no "significantly clear evidence of a legitimate supervening purpose," *Max Sugarman* at 1255, the evidence presented is conclusive of a transfer avoidable by the Trustee under 11 U.S.C. § 548(a)(1).

### B. Constructive fraud

■ The Trustee also asserts that the transfer constituted constructive fraud under 11 U.S.C. § 548(a)(2).[17] The inquiry can be narrowed to whether Thomas' transfer of his beneficial interest in the Trust was made for "less than a reasonably equivalent value in exchange for such transfer." 11 U.S.C. § 548(a)(2)(A). The other elements, a transfer within one year and insolvency, have already been held to exist.

The Trustee concedes that the $35,591.55 net proceeds of the Trust's refinancing were consideration to Thomas for the transfer of his beneficial interest in the Trust to Joseph. I disagree, as discussed previously.

Joseph paid *nothing* for Thomas' beneficial interest. There is no evidence that Joseph assumed any personal liability under the note securing the refinanced mortgage. The Trust itself, borrowing against its own assets, obtained funds which it paid to Thomas. Thomas transferred his beneficial interest to Joseph at the same time, but without payment. The situation is a close parallel to a leveraged buyout, which is often held to be a fraudulent transfer under § 548. *See., e.g., Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978 (1st Cir.1983).

If Joseph had paid any consideration for the transfer, his memorandum suggests that he would be entitled to the benefit of 11 U.S.C. § 548(c) which gives a good faith transferee rights against the asset transferred to the extent that value was given.[18] Since I hold that Joseph gave no value, I need not consider Joseph's *bona fides* as a transferee.[19]

### C. Denial of discharge

■ The Trustee further asserts that Thomas should be denied his discharge because the transfer of the beneficial interest in the Trust, which I have found to be a fraudulent transfer, invokes 11 U.S.C. § 727(a)(2)(A).[20]

The elements of that section parallel those of § 548(a) and I find that the same findings

---

**17.** "(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
. . . .
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation. . . . ."

**18.** "Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien or may retain any interest transferred, or

may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."

**19.** If it had been necessary for me to do so, I would have found as a fact that Joseph was not a good faith purchaser.

**20.** "The court shall grant the debtor a discharge, unless—
. . . .
(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be, transferred, removed, destroyed, mutilated, or concealed—
(A) property of the debtor, within one year before the date of the filing of the petition . . . ."

of fact set forth above support the conclusion that Thomas should be denied his discharge.

### IV. Conclusion

I find that the transfer of Thomas' beneficial interest in the Trust to Joseph was a fraudulent transfer, made without consideration, that the Trustee is entitled to recover that interest from Joseph for the benefit of the estate pursuant to 11 U.S.C. § 548(a). I further find that Thomas should be denied his discharge pursuant to 11 *U.S.C.* § 727(a)(2)(A) for the same reasons.

A separate order will enter.

### ORDER

For the reasons stated in the accompanying Decision, I find that the transfer by the Debtor, Thomas J. Hegarty, of his beneficial interest in the Buttonwood Farm Realty Trust to Joseph R. Hegarty was a fraudulent transfer under 11 U.S.C. § 548, and I direct Joseph R. Hegarty to transfer that interest forthwith to Stephen E. Shamban in his capacity as Trustee of the Chapter 7 Estate of Thomas J. Hegarty.

In addition, for the reasons stated in the Decision, I deny Thomas J. Hegarty his discharge pursuant to 11 U.S.C. § 727(a)(2).