In re Thomas J. PRICHARD, Debtor.

Stephen E. Shamban, Chapter 7 Trustee, Plaintiff,

v.

Thomas J. Prichard, and Karen Prichard, Defendants.

Bankruptcy No. 03 14126 WCH. Adversary No. 03–1488.

United States Bankruptcy Court, D. Massachusetts, Eastern Division.

Feb. 12, 2007.

Patrick M. Morris, Attorney at Law, Sandwich, MA, for Debtor.

Stephen E. Shamban, Braintree, MA, pro se.

## MEMORANDUM OF DECISION

WILLIAM C. HILLMAN, Bankruptcy Judge.

### I. *Introduction*

The Chapter 7 Trustee (the "Trustee") filed this adversary proceeding seeking to avoid a transfer of real estate from Thom-

as J. Prichard ("Thomas") and his non-debtor wife Karen Prichard ("Karen") to Karen under the Uniform Fraudulent Conveyance Act ("UFCA") in effect at the time, and 11 U.S.C. § 548(a). The parties submitted a Joint Pretrial Memorandum ("*JPTM*") and I held a trial on September 29, 2006. Thomas and Karen, and Attorney Kathleen Snow, testified at trial, and seventeen (17) exhibits were received into evidence without objection.[1] The following discussion constitutes my findings of fact and conclusions of law.

### II. *Background*

In 1980, Thomas and Karen purchased a plot of land located at 111 Mountain Ash Road, Marston Mills, Massachusetts (the "Property") as tenants by the entirety for $7,500. Of this amount, Karen's parents provided $1,000, and Thomas and Karen contributed $6,500.[2] On the Property, Thomas and Karen built a single family home. In order to finance the construction of their home, Thomas and Karen obtained a mortgage loan of $42,100 from the Farmers Home Administration of the United States Department of Agriculture ("FmHA") in May, 1980. This mortgage, and a mortgage apparently confirming this transaction, were recorded with the Barnstable County Registry of Deeds on May 30 and June 3, 1980.[3]

In March, 1988, Thomas and Karen further borrowed $30,000 from Joan Anderson, Karen's sister. The promissory note Thomas and Karen executed to

---

1. At trial, counsel for Thomas and Karen jointly asserted that the Trustee's exhibits were also from the defendants. *See Trial Transcript ("Tr.")* 5–6. References hereinafter to the exhibits entered at trial will be to joint exhibits.

2. Thomas testified that this amount became part of their total mortgage loan from Farmers Home Administration. *Tr.* 33.

3. The parties agreed that it appears that the second mortgage recorded on June 3, 1980 was a "confirmatory" mortgage of the earlier mortgage recorded on May 30, 1980. *See JPTM* 4, ¶ 13; *Joint Exhibits 1—3.*

Anderson indicates that the amount would be secured by a mortgage against the Property, although no such mortgage securing the note appears to ever have been recorded. *JPTM* 4, ¶ 13; *Joint Exhibit 4.* Thomas and Karen both independently testified that they borrowed this money in order to pay Thomas' debts. *Tr.* 55, 71.[4] Thomas testified that Karen repaid this debt to her sister at an unspecified time without contribution from him. *Tr.* 55. Thomas estimated that the balance on the FmHA mortgage as of April, 1990 was approximately $30,000,[5] and that an additional recapture amount due on the FmHA financing was also approximately $30,000. *Tr.* 63, 66. Thomas also estimated that the market value of the Property in 1990 was around $100,000. *Tr.* 62–63.

Thomas also had additional debts which had arisen from his work as a self-employed handyman and carpenter, and he testified that at one point he had done business as a proprietorship under the name "The Caretaker." *Tr.* 29–30, 53. Thomas d/b/a The Caretaker had, in the late 1980s, run into disputes with at least three different parties. Two individuals, Aarmand Mathis and John Van Amsterdam, filed separate lawsuits in the Barnstable Division of the District Court Department ("Barnstable District Court") on January 31, 1990 against Thomas on account of Thomas' nonpayment of two promissory notes for $3,000 each, dated April 14, 1989 and July 21, 1989. *See Joint Exhibits 16 and 17.* Mathis and Van Amsterdam obtained writs of attachment against the Property each in the sum of $3,500 on or around April 20, 1990, and recorded the writs of attachment against

the Property on April 23, 1990. *See JPTM* 4–5, ¶ 22; *Joint Exhibits 10 and 11.*

Thomas also acknowledged that he had entered into a contract on or around June 21, 1988 with Ruth and Richard Bens to perform some work for them for $51,300. *Tr.* 38. Thomas testified that the Benses owed him funds for work on a separate project which led to a dispute. The Benses eventually also filed a lawsuit against Thomas d/b/a The Caretaker in the Barnstable District Court on April 23, 1990. *Tr.* 58–59; *Joint Exhibit 15.* Thomas denied ever having been personally served with the Bens' lawsuit, since he was living in Florida at the time. *Tr.* 59. Nonetheless, the Benses obtained a writ of attachment against the Property up to the sum of $69,600. The Benses recorded the writ of attachment against the Property on or around May 10, 1990. *See JPTM* 4–5, ¶ 25; *Joint Exhibit 15.* On or about July 10, 1990, a judgment entered in favor of the Benses against Thomas, and they obtained an execution against Thomas on October 17, 1990 in the total sum of $74,074.70. *JPTM* 6, ¶ 26.

In the late 1980s, Thomas and Karen testified to having marital problems, due to the debt incurred with Karen's sister for Thomas' debt, Thomas' drinking and Thomas' general neglect of Karen and their two children, age twelve (12) and six (6). *Tr.* 55–56; *Tr.* 77–78. During this time, Thomas came and went from the Property, and by September, 1989, he had established a separate residence in Cotuit, Massachusetts. *Tr.* 56. After that time, Thomas lived at a number of other places,

---

**4.** At the Trustee's request, the witnesses were sequestered during the trial, and each testified outside of the presence of the other witnesses. *Tr.* 4.

**5.** Thomas and Karen did not produce one exhibit referred to in the *JPTM,* a purported mortgage balance statement as of April, 1990. *Tr.* at 5. However, Thomas testified as to his estimate of the mortgage balance as of that time without objection. *Tr.* at 63.

including Florida, and did not move back into the Property until 1994. *Id.* Karen testified that during that time she supported herself and her children by working and receiving support from her parents, while Thomas contributed nothing. *Tr.* 78–79. Karen testified that she believed that she had taken care of her husband's debts, and that although she mistrusted him, she had not known for a fact of his continuing financial problems. *Tr.* 71–72.

Thomas and Karen ultimately filed a Complaint for Separate Support and Separation Agreement with the Barnstable Division of the Probate and Family Court Department ("Barnstable Probate and Family Court") on April 10 and April 12, 1990 respectively. *See Joint Exhibits 8 and 6.* The April 12, 1990 judgment on this complaint incorporated the separation agreement. *See Joint Exhibit 7.* The separation agreement provided that Thomas would convey all of his interest in the Property to Karen, and Karen would assume the mortgage and all of the other household bills. *JPTM 5, ¶ 17; Joint Exhibit 6, ¶¶ 5–7.* The separation agreement also provided that Thomas would transfer all of the interest in his furnishings in the home, bank accounts and two vehicles to Karen. *JPTM 5, ¶ 18; Joint Exhibit 6, ¶ 8.* Thomas would also pay Karen $800 per week for the care and maintenance of the minor children until they were emancipated as defined in the separation agreement. On April 12, 1990, Thomas conveyed his interest in the Property to Karen, "in full consideration of the mutual covenants and conditions" set forth in the separation agreement. *JPTM 4, ¶ 14; Joint Exhibit 5.* Karen recorded a declaration of homestead on the Property on May 4, 1990. *JPTM 6, ¶ 23; Joint Exhibit 12.* Karen testified that the reason for her assuming the obligations for the Property was because "the marriage was over" and Thomas "didn't

want any part of it," and to be able to continue to provide a home for the children. *Tr.* 79.

Thomas submitted a financial statement to the Barnstable Probate and Family Court with the separation agreement on April 12, 1990, on which he indicated his "assets" to be "0," and his "liabilities" to be "0." *See Joint Exhibit 9.* When the Trustee asked Thomas why he had listed zero for his assets and liabilities on that statement, Thomas testified that he honestly could not recall. *Tr.* 35–36. Thomas testified that, at that time, he had, in fact, "had plenty of assets," but did not know why he did not list them on the financial statement. *Tr.* 44. Thomas also testified that he was able to repay the amounts owed to Mathis and Van Amsterdam, but that he "chose not to." *Tr.* 45. Thomas listed the Benses, Mathis and Van Amsterdam as unsecured judgment creditors in his chapter 7 bankruptcy petition. *See In re: Thomas J. Prichard, Case No. 03–14126–WCH* (hereinafter *Case No. 03–14126*), Docket No. 1.

Thomas and Karen lived apart between 1990 and 1994, but Karen testified that she allowed him to continue to visit the Property sporadically for sake of the children. *Tr.* 80. Thomas and Karen eventually reconciled to a certain extent in 1994 or 1995, and Thomas returned to live in the Property, where he currently lives today. With respect to this arrangement, Karen testified that Thomas has his own room and "comes and goes as he pleases," and that it is not a "normal situation," but that they are "civil" and have learned to "co-exist and live together." *Tr.* 82.

Thomas filed his bankruptcy case on May 14, 2003, and the Trustee commenced this adversary proceeding on November 24, 2003, seeking an avoidance of the April 12, 1990 transfer to Karen under §§ 4 and

7 of the UFCA, Mass. Gen. Laws. ch.109A, in effect in 1990, and 11 U.S.C. § 548(a). The Trustee also seeks a declaratory judgment of his rights against what he alleges to be Thomas' undisclosed 50% interest in the Property, and for permission to sell the 50% interest under 11 U.S.C. § 363(h).

Thomas and Karen, by their respective counsel, each filed an answer to the Trustee's complaint. In each of their answers, Thomas and Karen pled the expiration of the statute of limitations and other affirmative defenses to the Trustee's action. *See Shamban v. Prichard, Case No. 03–1488–WCH* (hereinafter *Case No. 03–1488*), Docket Nos. 7–8. In the *JPTM*, however, the statute of limitations or other affirmative defenses were not raised. The *JPTM* lists the following as the only issues of law to be litigated: (1) whether the transfer from Thomas to Karen was fraudulent under § 4 of the UFCA; (2) whether the transfer was fraudulent under § 7 of the UFCA; (3) whether the transfer was fraudulent under 11 U.S.C. § 548(a) and continuing concealment doctrine; (4) whether the Trustee is entitled to a declaratory judgment regarding his rights to the Property; (5) whether the Property may be sold by the Trustee pursuant to 11 U.S.C. § 363(h). *JPTM* at 9. At the conclusion of the trial on September 29, 2006, I took the matter under advisement. I also gave the parties the option of submitting post-trial briefs by October 29, 2006.[6] *Tr.* 88. Neither of the parties filed any such briefs.

6. I subsequently extended this deadline to November 21, 2006, at the parties' request. *Case No. 03–1488,* Docket No. 24.

7. The Massachusetts legislature repealed the UFCA by the enactment of the Uniform Fraudulent Transfer Act ("UFTA") in 1996, but the UFCA governs this case since it was in force at the time of the conveyance in issue.

### III. *Discussion*

■ Under § 7 of the UFCA, every conveyance made and obligation incurred with actual intent to hinder, delay or defraud either present or future creditors was fraudulent as to both present and future creditors. Mass. Gen. Laws Ann. ch. 109A, § 7 (1990).[7] As debtors will rarely admit an actual intent to defraud, courts have long considered certain recognized indicia to determine the existence of fraudulent intent in the context of a fraudulent conveyance action. *See, e.g., Sharp Int'l. Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l. Corp.),* 403 F.3d 43, 56 (2nd Cir.2005) (holding that in fraudulent conveyance action, pleader may rely on badges of fraud to support inference of actual fraudulent intent); *Official Unsecured Creditors Comm. of Long Dev., Inc. v. Oak Park Village Ltd. P'ship et al. (In re Matter of Long Dev., Inc.),* 211 B.R. 874, 886–87 (Bankr.W.D.Mich.1995) (listing various indicia of fraud courts have considered to determine fraudulent intent in context of a fraudulent conveyance action); *see also BFP v. Resolution Trust Corp.,* 511 U.S. 531, 540–41, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (noting that proof of certain objective facts as to a fraudulent transfer under badges of fraud doctrine raises a rebuttable presumption of actual fraudulent intent (citing *Twyne's Case,* 3 Coke Rep. 80b, 76 Eng.Rep. 809 (K.B. 1601))).

■ The factors considered in a fraudulent conveyance action under the UFCA are similar to the factors consid-

*See First Federal Savings & Loan Assoc. v. Napoleon,* 428 Mass. 371, 372–73, 701 N.E.2d 350, 352 (Mass.1998) (citing *Carpenter v. Granderson (In re Granderson),* 214 B.R. 671, 675 (Bankr.D.Mass.1997) and *Noonan v. Rauh (In re Rauh),* 119 F.3d 46, 48 n. 2 (1st Cir.1997)).

ered in a fraudulent conveyance action under 11 U.S.C. § 548(a). *Compare Long,* 211 B.R. at 886–87 *with Max Sugarman Funeral Home, Inc. et al. v. A.D.B. Investors,* 926 F.2d 1248, 1254 (1st Cir.1991). These factors include: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; (5) retention by the debtor of the property involved in the putative transfer. *Max Sugarman Funeral Home,* 926 F.2d at 1254. "The presence of a single badge of fraud may spur mere suspicion," but "the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Id.* at 1255; *Cogliano v. Hegarty, (In re Hegarty),* 208 B.R. 760, 766 (Bankr. D.Mass.1997).

■ I could conclude that the Trustee met his initial burden of demonstrating actual fraud under § 7 of the UFCA simply because Thomas conveyed his property in favor of a family member over his creditors. *See Boston Trading Group v. Burnazos,* 835 F.2d 1504, 1508 (1st Cir.1988) (describing transfer of property to a person in a special relationship as one of the scenarios in which a debtor's actions demonstrate actual fraud under § 7). But as the challenged transfer in this case concerns more than a single suspicious indication of fraud, I consider all of the factors, and Thomas and Karen's reasons for the transfer.

■ First, on April 12, 1990, Thomas transferred all or substantially all of his property, his interest in the Property, furnishings, bank accounts and two vehicles to Karen while the Mathis and Van Amsterdam lawsuits were pending against him, and the Benses were about to file their lawsuit. I do not find credible Thomas' assertion that he "had plenty of assets" at that time, based on his demeanor at trial and inability to remember the reason for his incomplete responses on the financial statement. Second, I also conclude that Thomas was insolvent or rendered insolvent at the time that he conveyed his interest in the Property to Karen, based on his own admission in his 1990 financial statement that he had zero assets, and the pending litigation demonstrating that his liabilities were greater than zero. Third, Karen was and still is Thomas' wife, and even though they separated, Thomas was allowed to come back to the Property whenever he wanted, and currently resides there now. Fourth, even though Thomas transferred his legal interest in the Property to Karen, he has continued to derive the benefits of residence in the Property, on and off for the past 17 years. Accordingly, the Trustee has satisfied his initial burden under § 7 of the UFCA.[8]

---

8. The Trustee also bears the burden of establishing his standing to bring an avoidance action. Standing under § 4 of the UFCA is limited to creditors whose claims against the debtor were in existence at the time of the conveyance. *Goldstein v. Lassman (In re Goldstein)* 194 B.R. 1, 2–3 (Bankr.D.Mass. 1996). Because conveyances fraudulent under § 7 of the UFCA are fraudulent as to past and present creditors, with respect to § 7 of the UFCA, I find that the standing requirement is not in issue.

I also will not consider Thomas and Karen's affirmative defenses, since none were raised in the *JPTM,* at trial, or otherwise, and accordingly conclude that they were waived. *See, e.g., López–Stubbe v. Rua (In re Colonial Mortgage Bankers Corp.),* 228 B.R. 516, 523 (1st Cir. BAP 1999) (finding affirmative defense of statute of limitations not pled in answer or proposed pre-trial order waived by parties (citing *Federal Deposit Ins. Corp. v. Ramirez–Rivera,* 869 F.2d 624, 626–27 (1st

■ The question then becomes whether Thomas and Karen presented sufficient evidence of a legitimate supervening purpose for the transfer of the Property, such as to rebut the indication that Thomas and Karen effected the transfer of the Property with fraudulent intent. The testimony of both Thomas and Karen established that the transfer occurred following a period of time during which they were suffering through marital difficulties. Karen testified that the reasons for her legally assuming the obligations for the Property was to be able to continue to provide a home for the children, and because "the marriage was over" and Thomas "didn't want any part of it." *Tr.* 79. Due to Thomas' many problems, Thomas had established a separate residence before he even transferred his interest in the Property. Thomas had stopped paying the mortgage, real estate taxes and maintenance on the Property. The transfer was made in consideration of additional maintenance obligations in the separation agreement. *JPTM* 5, ¶ 17; *Joint Exhibit 6,* ¶¶ 5–7. The conveyance and homestead were duly recorded, and made part of the public record. *JPTM* 4, ¶ 14; 6, ¶ 23; *Joint Exhibits 5, 12.* No creditors challenged the transfer at the time.

Consequently at the time of the transfer, Thomas did not retain any interest in the Property, but transferred his interest in it to Karen who assumed complete responsibility for the Property and household's upkeep. To conclude now that this transaction was some sort of sham would require that I find that Thomas and Karen staged their marital difficulties, while Thomas set up separate residences in 1989 and for the five years following, with the full intention of eventually returning to live in the Property in 1994. The evidence does not so prove and I do not so conclude. *See, e.g., Zamudio v. Zamudio (In re Zamudio),* 2005 WL 2035969, at *10 (Bankr.N.D.Ill. 2005) (court declining to find that transfer of marital residence was a sham transaction executed to allow the debtor to avoid his creditors where transfer was made in consideration of additional maintenance obligations and not effectuated with secrecy, and distinguishing cases). Rather, I find under the circumstances of Thomas and Karen's marital difficulties leading to their separation, there existed legitimate reasons for the transfer of the Property that overcome the presumption that the transfer of the Property was fraudulent.

■ I also do not find that the transfer was constructively fraudulent under § 4 of the UFCA. Section 4 of the UFCA defined a conveyance as fraudulent without regard to actual intent if the conveyance was made by a person who is insolvent,[9] and without fair consideration.[10] Mass. Gen. Laws Ann. ch. 109A, § 4 (1990); *Shamban v. O'Brien (In re O'Brien),* 190 B.R. 1, 3 (Bankr.D.Mass.1995). While I find that

Cir.1989) and *Badway v. United States,* 367 F.2d 22, 25 (1st Cir.1966))).

9. UFCA § 2 provided: "(1) A person is insolvent within the meaning of this chapter when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured ..." Mass. Gen. Laws Ann. ch. 109A, § 2 (1990).

10. UFCA § 3 provided: "Fair consideration is given for property or obligation—(a) When in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or (b) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained ..." Mass. Gen. Laws Ann. ch. 109A, § 3 (1990).

Thomas was insolvent at the time that he conveyed his interest in the Property to Karen, based on his own admission in the 1990 financial statement, I conclude that the separation agreement between Thomas and Karen, under the circumstances of the marital difficulties outlined above, constituted fair consideration for the transfer of the Property.[11]

Under § 3 of the UFCA, a party gave fair consideration for a property or obligation if the transfer involved (1) the discharge of an antecedent debt, or the conveyance of other property, (2) in exchange for fair equivalent value, and (3) good faith. *See Sharp Int'l Corp.*, 403 F.3d at 53 (setting out elements of fair consideration test under New York fraudulent conveyance provision identical to UFCA § 3);[12] Mass. Gen. Laws Ann. ch. 109A, § 3 (1990). New York courts have found that fair consideration existed with respect to a transfer of property under a separation agreement, where the insolvent debtor owed an antecedent debt of support or otherwise to his wife, and the transferee took the property in good faith. *See Federal Deposit Ins. Co. v. Malin*, 802 F.2d 12, 19 (2nd Cir.1986); *Pryor v. Fair (In re Fair)*, 142 B.R. 628, 631 (Bankr.E.D.N.Y. 1992); *compare HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059–60 (2nd Cir. 1995) (finding that conveyance effected pursuant to prenuptial agreement satisfied no antecedent debt or otherwise fair equivalent exchange and was fraudulent). A past debt is a consideration for a conveyance, both at common law and under the Statute of Elizabeth, prohibiting fraudulent conveyances. *Levy v. Weidhorn*, 287 F. 754, 757 (D.Mass.1923).

In this case, Thomas did not repay the $30,000 Karen borrowed from her sister for the payment of Thomas' debts. Moreover, Thomas had not been contributing anything to the payment of the mortgage and other household bills, from the time he moved out of the Property in 1989. In satisfaction of these antecedent debts, Thomas conveyed to Karen his interest in the Property, furnishings in the home, bank accounts and two vehicles. Thomas testified that the value of the Property was $100,000, and that the approximate balance due under the FmHA financing in April, 1990 was $60,000. *Tr.* 63, 66. Thomas' 50% interest in the Property as of that time was therefore approximately $20,000, an amount which was less than the debt Karen had repaid to her sister. In addition, while they were already separated and living apart, Thomas and Karen negotiated terms in the separation agreement for the division of their property and maintenance interests. The separation agreement also provided that Thomas would also pay Karen $800 per week for the care and maintenance of the minor children until they were emancipated as defined in the agreement. Karen would also formally assume the mortgage and all of the other household bills. Finally, Karen also testified that she had not known for a fact of his continuing financial problems even after she had borrowed money to pay off his debt. *Tr.* 71–72. I therefore find that Karen, as the transferee of the Property and other consideration under separation agreement, exchanged a fair equivalent, and received the transfer in good faith. *See., e.g., Boston Trading Group, Inc.*, 835

---

11. Additionally, I do not find that the Trustee satisfied his burden of establishing his standing to bring an avoidance action under § 4 of the UFCA. *See supra* note 8.

12. In construing provisions identical to that of the Massachusetts UFCA, New York courts have encouraged recourse to the case law of other jurisdictions, consistent with a policy in favor of national uniformity in UFCA law. *See Sharp Int'l. Corp.*, 403 F.3d at 54.

20

F.2d at 1512 (citing cases discussing fair equivalent, and holding that a transferee's subjective appreciation, good faith, of the situation surrounding an exchange could help a court determine whether the exchange was a fair one). For the reasons that I conclude that the transfer of the Property was not actually or constructively fraudulent under §§ 4 or 7 of the UFCA, I also do not conclude that the transfer of the Property was actually or constructively fraudulent for the purposes of 11 U.S.C. § 548(a).

## IV. *Conclusion*

For the foregoing reasons, I will enter an order granting judgment for the defendants.